RISHWORTH v. MOSS et al.    (No. 5732.)

(Court of Civil Appeals of Texas. San Antonio. Dec. 6, 1916. On Motion for Rehearing, Feb. 14, 1917.)

1. PARENT AND CHILD ☞12 — AGENCY OF CHILD—QUESTION FOR JURY—CONSENT TO OPERATION.

In an action for the death of plaintiff's minor daughter following an operation for the removal of tonsils and adenoids by surgeons to whom she had been taken by her adult sister, whom she was visiting at the time, evidence *held* not sufficient to warrant the jury in finding that the sister had either express or implied authority to give consent to the operation on behalf of the parents.

[Ed. Note.—For other cases, see Parent and Child, Cent. Dig. §§ 141–144; Dec. Dig. ☞12.]

2. PRINCIPAL AND AGENT ☞19, 119(1), 147(2) —AUTHORITY OF AGENT—BURDEN OF PROOF.

Persons dealing with an assumed agent are bound at their peril to ascertain the fact of the agency and the extent of the agent's authority, and in case either is controverted, the burden is on such persons to establish it.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 36, 391, 393, 398, 399, 401, 529, 531, 533; Dec. Dig. ☞19, 119(1), 147(2).]

3. PRINCIPAL AND AGENT ☞22(1)—AUTHORITY OF AGENT—DECLARATION.

To determine whether agency existed, the court must look, not to the acts and declarations of the person assuming to be an agent, but to the transactions between such person and the alleged principals.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 40; Dec. Dig. ☞22(1).]

4. PARENT AND CHILD ☞12—OPERATION ON CHILD—CONSENT—IMPLIED AUTHORITY.

An adult sister, whom an 11 year old child was visiting with the consent of its parents, though she has implied authority to employ a physician if the child became ill, or to have an operation performed if there is an emergency making it necessary to preserve the child's life, has no implied authority to give consent to an operation for which there is no immediate necessity.

[Ed. Note.—For other cases, see Parent and Child, Cent. Dig. §§ 141–144; Dec. Dig. ☞12.]

5. PARENT AND CHILD ☞12—OPERATION ON CHILD — CONSENT OF PARENTS — APPARENT AUTHORITY.

Surgeons cannot rely on the apparent authority of the sister of a child to give her parents' consent to an operation involving the use of a general anæsthetic, where there was no act on the part of the parents to lead them to believe the sister had such authority, and they did not even know that the child was lawfully intrusted to the custody of the sister, since the authority of an agent can only be established by tracing it to some word or act of the alleged principal.

[Ed. Note.—For other cases, see Parent and Child, Cent. Dig. §§ 141–144; Dec. Dig. ☞12.]

6. APPEAL AND ERROR ☞728(2)—QUESTIONS PRESENTED—ADMISSION OF EVIDENCE—GENERAL ASSIGNMENT—BILL OF EXCEPTIONS.

Where an assignment of error, complaining of certain testimony in general terms, did not show what witnesses' testimony was objected to, and the bills of exceptions were filed after the expiration of time allowed therefor, so that

---

they cannot be considered, the assignment must be overruled.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3011; Dec. Dig. ⚫➔728(2).]

7. PHYSICIANS AND SURGEONS ⚫➔18(7)—OPERATION ON CHILD—ADMISSIBILITY OF EVIDENCE—NECESSITY FOR OPERATION.

In an action for the death of plaintiff's child while surgeons were operating on her, where there was no evidence that plaintiff had consented to the operation, and no emergency was pleaded or proved, expert testimony as to condition of the child's health and the advisability of the operation is inadmissible.

[Ed. Note.—For other cases, see Physicians and Surgeons, Cent. Dig. §§ 40, 41; Dec. Dig. ⚫➔18(7).]

8. TRIAL ⚫➔256(6)—OMISSION FROM CHARGE—NECESSITY OF SPECIAL REQUEST.

In such an action, if the plaintiff objected to the submission of the issue of implied or apparent authority of the child's sister, whom she was visiting, to give his consent because it was not specifically stated that such authority must be predicated on the acts of plaintiff, it was his duty to supply the omission by a special charge.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 634; Dec. Dig. ⚫➔256(6).]

9. TRIAL ⚫➔267(2)—INSTRUCTIONS—REQUESTS—FAILURE TO CHARGE.

Error cannot be assigned to the failure to give portions of special charges, for if any part of the charge is erroneous, the court can ignore it altogether.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 668; Dec. Dig. ⚫➔267(2).]

### On Motion for Rehearing.

10. DEATH ⚫➔16—PARENT AND CHILD ⚫➔7(1)—LOSS OF SERVICES—RIGHT OF ACTION.

At common law a parent could recover for loss of a child's services caused by injuries not resulting in death, or for expenses incurred and loss of services between the injuries and the death, where that was appreciable, but could not recover where her death resulted instantaneously or practically so.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 18; Dec. Dig. ⚫➔16; Parent and Child, Cent. Dig. §§ 72, 86, 89, 95; Dec. Dig. ⚫➔7(1).]

11. DEATH ⚫➔15—ACTION FOR CAUSING—OPERATION ON PATIENT—CONSENT.

A patient 11 years of age is incapable of consenting to an operation on herself, and can recover against the surgeon performing an operation to which her parents did not consent, notwithstanding her consent thereto, and therefore, in case of death resulting therefrom, her parents can recover under Rev. St. 1911, art. 4695, giving a right of action for death resulting from injuries in cases where the injured person could have maintained an action if death had not resulted, and the damages recovered by the parents are not limited by the fact that the patient could have recovered only nominal damages if she had survived.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 17; Dec. Dig. ⚫➔15.]

12. DEATH ⚫➔84—DAMAGES—FUNERAL EXPENSES—EVIDENCE.

In an action for wrongfully causing death, there can be no recovery for funeral expenses paid, unless there is proof that the amounts charged were reasonable.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 110; Dec. Dig. ⚫➔84.]

13. DEATH ⚫➔58(2)—LOSS OF SERVICES—DAMAGES—EVIDENCE.

The jury can estimate the value of the services of a patient and the cost of supporting it, the same as an expert could, and can render a verdict for the parents for the loss of such services, though there is no evidence as to their value.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 77; Dec. Dig. ⚫➔58(2).]

14. APPEAL AND ERROR ⚫➔1171(6)—REVIEW—VERDICT—EVIDENCE—DAMAGES FOR DEATH.

In an action for the death of a child, where there was no evidence as to value of the services or the costs of support, the jury may find that the parents have suffered no pecuniary loss, and the rule of nominal damages does not apply, so that a verdict for defendants cannot be set aside, though plaintiffs' right to recover is established as a matter of law.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4553; Dec. Dig. ⚫➔1171(6); Damages, Cent. Dig. § 16.]

15. APPEAL AND ERROR ⚫➔1066 — PREJUDICIAL ERROR — ABSTRACT CHARGE — SUBMISSION OF ISSUE.

In an action for the death of plaintiff's child during an operation to which plaintiff had not consented in person, and where there was no evidence to sustain a finding of implied or apparent authority to another to consent, the giving of a charge, correctly defining implied or apparent authority to be used in determining the issue of consent over the objection that there was no evidence to support the charge, was prejudicial error.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4220; Dec. Dig. ⚫➔1066; Trial, Cent. Dig. § 596.]

16. APPEAL AND ERROR ⚫➔882(12)—INVITED ERROR—REQUESTED CHARGE.

Where plaintiffs properly objected to a charge submitting the issue of implied or apparent authority to give their consent to an operation on their child because the evidence did not warrant the submission of that issue, a requested charge, defining implied and apparent authority and stating that there was no evidence to show such authority, does not prevent reversal on the theory of invited error; there being nothing in the record to show that the charges were not first read and excepted to, and then the request made, the order fixed by Rev. St. 1911, arts. 1971, 1973, as amended by Acts 33d Leg. c. 59, § 3 (Vernon's Sayles' Ann. Civ. St. 1914, arts. 1971, 1973), or to show that the court's charge was influenced in any way by the requested charge.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3602; Dec. Dig. ⚫➔882(12).]

Appeal from District Court, Bexar County; R. B. Minor, Judge.

Action by William H. Rishworth against Robert E. Moss and another. Judgment for the defendants, and plaintiff appeals. Reversed and remanded, and motion for rehearing overruled.

Leo Tarleton and Ryan & Matlock, all of San Antonio, for appellant. H. C. Carter, Champe G. Carter, R. L. Carter, and Perry J. Lewis, all of San Antonio, for appellees.

MOURSUND, J. William Rishworth, on September 16, 1910, sued Robert E. Moss and L. K. Beck for damages alleged to have been sustained on account of the death of his

daughter, Imogene, which occurred within a few minutes after an operation had been performed upon her for the removal of adenoids and tonsils. The original petition contained charges of unskillfulness and negligence, as well as allegations to the effect that the operation was performed without the consent of plaintiff and his wife. The case was tried and a judgment rendered in favor of defendants, which was reversed by this court. See 159 S. W. 122. Upon the second trial plaintiff, after introducing the testimony of one medical expert, abandoned all charges of negligence, and relied solely upon his allegations to the effect that the operation had been performed without the request or the consent, express or implied, of plaintiff and his wife, and that no one had any authority from plaintiff or his wife to permit such operation to be performed. He alleged that Imogene was 11 years of age, and resided with him near Center Point, about 60 miles from San Antonio; that she was in good health, and made a social visit to San Antonio to be a guest of her two unmarried sisters for a week or ten days; that while in San Antonio defendants performed the operation upon her; and that she died from the application of chloroform and on account of the shock she sustained on account of the means employed in performing the operation. Defendants answered by general denial; allegations to the effect that Imogene was brought to the office of defendant Moss by her two adult sisters, and was in a very bad state of health; that she was suffering from adenoids and her tonsils were very much enlarged, inflamed, and diseased; that she was run-down and in a delicate condition; that her serious condition rendered her in pressing need of surgical attention to remove said adenoids and tonsils; that the operation was urgently necessary for the present health of the child, and was performed at the request and with the consent of said child and her two adult sisters; that Imogene was in charge of and under the control of Mrs. Jesse, an adult daughter of plaintiff, a woman of sound judgment and discretion, with authority from plaintiff to look after her needs, necessities, and comforts; that Mrs. Jesse, being a trained nurse and skilled in the disease of adenoids and tonsils, discovered that the child was in a bad state of health, and brought her to defendant Moss for examination, and had the express authority, as well as the implied and apparent authority, to provide for the care, comfort, and necessities of Imogene, and, acting under that authority she and Imogene requested defendant Moss to make an examination and operate upon Imogene for the removal of tonsils and adenoids; that defendant Moss believed Mrs. Jesse had the right and authority from her parents to do as she did, and that in all things she acted for the best interest of said minor sister, to save and preserve her health and happiness; that under all the facts and circumstances Mrs. Jesse had authority to act for plaintiff in providing Imogene with such medical and surgical services as her condition rendered necessary, and, in so doing, to represent plaintiff and that she acted with authority, both express and implied; that defendants had a right to believe that Mrs. Jesse was acting in the place of and for her father and had authority to provide the necessary medical attention for said child during the time she was in her charge. In addition, defendant Beck pleaded that at the time such operation was performed he was merely an employé of Dr. Moss for a salary, and did not operate on plaintiff's daughter, but made the examination of her condition and administered the anæsthetic as an employé of Dr. Moss. The plaintiff denied defendants' allegations. The trial resulted in a verdict and judgment in favor of defendants.

By his first assignment appellant contends that the verdict of the jury is contrary to the undisputed evidence. Appellant undertakes to set out all the testimony, and contends that it shows beyond dispute that there was no consent, express or implied, upon the part of himself or wife, to the performance of the operation. We find that appellee contends that appellant, by requesting, as his special charge No. 1, an instruction, which, if given, would have submitted the issue of consent, is estopped to question the sufficiency of the evidence to sustain the verdict returned upon that very issue. It appears that special charge No. 2 (presumably presented after No. 1, Railway v. Eyer, 96 Tex. 76, 70 S. W. 529) contains minute instructions concerning implied and apparent authority, and closes by stating that there is no evidence of authority, and therefore to return a verdict for plaintiff. It also appears that objections, in writing, to the charge of the court were duly filed, which were to the effect that there was no evidence to dispute the fact that neither plaintiff nor his wife ever consented to the operation, and that the evidence does not justify any finding of implied authority to perform the operation. The objections and special charges were all presented to the court before he read his charge to the jury. The record fails to disclose that special charge No. 1 was requested after plaintiff's objections to the charge of the court had been overruled, and we must assume that the requests and objections were filed at the same time. There is authority to the effect, we think, that in such a case plaintiff cannot be heard to complain of the action of the court. We find, however, that in the recent case of Paris & G. N. Ry. Co. v. Flanders, 179 S. W. 263, our Supreme Court expressed the opinion that the doctrine of invited error can easily be carried too far, and suggested that the responsibility for the court's action in the commission of hurtful errors ought not to be transferred to a litigant unless it is reasonably plain that through the action of his

counsel he is equally chargeable with the mistake. In the cited case stress was laid upon the proposition that no contention appeared to have been made that the issue was not one proper to be submitted. In this case we conclude, in view of what is said in the above-cited case, we should overrule the contention that appellant invited the error, if error there be in holding there was sufficient evidence to go to the jury on the issue of consent. We will therefore consider the assignment of error.

Imogene Rishworth, a child 11 years of age, resided with her parents at Center Point, 60 miles from San Antonio. Center Point has railroad, telegraph, and telephone connection with San Antonio. The school Imogene attended closed on Friday, May 6, 1910, and on that day her two sisters, Clara and Nettie, aged, respectively, about 22 and 20 years, came from San Antonio to their parents' home. These young ladies had been in training at a hospital in San Antonio, with the view of becoming professional nurses. The elder, Clara, now Mrs. Jesse, had been at the P. & S. Hospital for three years, and was a very competent nurse. Her father testified that he had confidence in her ability as a nurse; that she was sensible and a girl of good judgment; that he had every confidence in her that a father had in his daughter. On Sunday, May 8, 1910, Clara and Nettie, who had been visiting their parents, returned to San Antonio, and Imogene accompanied them. Her parents testified that at that time their daughters were not in the hospital, and resided on Dallas street in San Antonio, and that Imogene was to pay them a social visit for a week or ten days. Imogene was a delicate child, and often had temperature. Her parents stated she had been suffering with rheumatism, the father fixing the time as probably during the previous winter, while the mother said it was 2 years prior to her death. They testified she was relieved by the application of liniment, and that she did not stay away from school on account of such rheumatism; that she attended school the entire term. Rishworth testified he had never had her tonsils examined; that his daughter Clara, about a year before Imogene's death, had stated that the child had adenoids and said they ought to be removed; that his wife objected on the ground that there was always danger in such operations, and nothing further was said; that his wife objected several times, objected all the time. He testified that he had never authorized any one to operate on his child, and was never requested to give authority to have an operation performed on her for adenoids or anything; that he did not know that such a thing was in contemplation. On cross-examination he testified as follows:

"On this occasion, in May, 1910, Miss Clara came to Center Point on Friday to visit me before they came down here on Sunday, and I permitted the child, Imogene, to come here with her on a visit of a week or ten days. That was done with my knowledge and consent. At that time I was on good terms with my daughter Clara, and I had confidence in her taking proper care of my daughter to a certain extent, but at the same time she was told, when she was leaving Center Point with the child, that if anything got the matter with my baby to let us know at once; that we would be down—we did not have confidence enough in her to let her go, take her to any doctor whatsoever and to be operated on; we would not have done it under any circumstances. Yes, sir; I had confidence enough in her to let her take my daughter on a visit here to San Antonio. I expected her to see that my daughter was properly cared for. I knew that my daughter would have to be fed, would have to have something to eat; I knew that my daughter would have to have shelter. Why, I don't know that she would have to be kept off of the streets and out of danger; she allowed her to go around and visit friends here all night before this operation. I would not have let my daughter go without having confidence that she would have proper care and would be properly taken care of. Yes, sir; I trusted my daughter, Mrs. Jesse, to give her proper care and attention. I expected Mrs. Jesse to see to it that my daughter was provided with proper food and lodging and everything she needed. When the baby left Center Point and when she got on the cars I gave her $10, and said: 'Get anything you want.' She could have fed herself as far as that was concerned. I did not expect my daughter Imogene to go to a hotel or boarding house."

He also said:

"I never said to my daughter Clara at home that it was all right with me if it was all right with her mother. When I let my daughter go with Miss Clara to San Antonio she was distinctly told that if she needed medical attention to let us know at once; we did not leave it with her at all, nor with any doctor in San Antonio. We were going to bring our own family physician with us if she needed one. She was told that at the depot. I did not have in mind that my daughter might need medical attention, but we were always anxious about her —I was foolish about that child; we were always uneasy about her; I was uneasy for fear she would get hurt, she was kicking, jumping, swinging all the time. I meant that if she met with any kind of accident to let us know at once by wire, and we would be down right away. Mrs. Jesse did not phone, nor write me about having my daughter examined by Dr. Moss; we got a card from Nettie, but it did not say anything about it. Nettie is not a nurse, and is in England. * * * When my daughter Imogene came to San Antonio with Mrs. Jesse there was nothing said about the expenses in San Antonio. I gave her $10 and told her (Imogene) to have a good time, and if it gave out to write me and I would send her some more. I did not have an understanding with my other daughters that they were to pay Imogene's expenses; I expected them to do it; I expected them to see to it that she had everything she needed. I gave her money and told her to draw on me for more if she needed it. Imogene was to be in San Antonio eight or ten days. I never relinquished my care and custody over my child (Imogene) and the rights of medical attention to her to anybody at any time."

Rishworth also testified that he told Imogene to write to him on Tuesday, but when he got in from his ranch to see if she had written, she had not, but there was a card from Nettie. His ranch was about 3½ miles from Center Point. He testified he received the card on Tuesday; that nothing was said

therein about having Imogene examined by Dr. Moss.

Mrs. Rishworth testified that Imogene had never been away from her prior to this visit to her sisters; that she permitted her to visit her sisters, but never consented to any operation upon her, and that no one ever applied to her for authority to perform such an operation; that when Clara spoke to her about Imogene having adenoids, and said they ought to come out, she replied: "No, never; no one will ever touch my baby." She further testified:

"I never relinquished control of my child in any way, or the employment of a surgeon, or anything. The last thing I told her, if anything happened, I must know it at once, and that I would be down on the next train and would bring Dr. Bell, and to trust no San Antonio doctor or 'anybody else. She (Mrs. Jesse) knew nobody was authorized. She was without authority, unless I and my family physician were present. The purpose of her visit was, her sisters wanted her to come and spend a week, just a visit; that is, come up here from that Sunday until the next. There was no legal authority to employ physicians or anything of that kind, just a friendly visit, that was all; and she (the daughter) did not wield any authority from me as custodian of my child."

Although appellant Rishworth took the deposition of his daughter Nettie, who resided in England at the time of the trial, she was not asked any questions concerning what occurred between her parents and herself and Clara with regard to Imogene's visit. She was asked questions relating to what occurred in Dr. Moss' office. She testified that she knew the defendants knew her father and mother were living; that she did not know if they made any effort to obtain their permission or consent to perform the operation.

Clara was brought into court under an attachment issued in behalf of her father, who did not place her upon the witness stand, but tendered her to defendant as a witness, and defendant did not place her upon the stand. It appears from the testimony of Dr. Moss that he had known Clara Rishworth for some time; that he saw her frequently at the P. & S. Hospital; that she had been on duty in the operating room at said hospital for from three to six months, and was considered among the brightest and most reliable girls there; that she was a woman of discretion and judgment. On Monday or Tuesday, May 8th or 9th, Clara, Nettie, and Imogene came to Dr. Moss' office, and Clara stated that she had been up home to visit her parents, and had brought her younger sister down with her to have Dr. Moss examine her and see if she did not need an operation for the removal of adenoids and tonsils, and she laughingly said:

"I have made the diagnosis myself, I guess; for she has had rheumatism and breathes through her mouth."

Dr. Moss examined Imogene, and stated that such an operation was very necessary, and that it was only a question of the time when it should be performed. They agreed upon a day for the operation, but at Nettie's request to Dr. Moss, by telephone, the time was postponed until Friday, May 13th. The three girls came about 15 minutes before the appointed time, and Dr. Moss then asked them something about their parents. Clara said they lived at Center Point, and that her father was amply able to pay for the operation, and that she wanted Dr. Moss to perform it because she had seen so much of his work at the hospital. Dr. Moss told her he asked because, if she was to pay for the operation, there would be no charge; she being a professional nurse. All of the girls wanted Dr. Moss to perform the operation, and none of them indicated to him that any unwillingness existed on the part of either of the parents to have the operation performed. He believed the parents had sent the girl down for the purpose of having the operation performed, and relied upon Clara and Nettie having the consent of their parents for what they were doing. The operation was performed, and about 10 minutes after it was completed the child died. The medical testimony shows that while it was very necessary for the health of the child that such operation should be performed, there was no emergency which required the operation to be performed at once. The testimony fails to show any negligence or unskillfulness in performing the operation or testing the heart, and plaintiff abandoned such charges after Dr. Frank Paschal, his witness, testified that in children of that age death resulted sometimes from the use of chloroform, on account of a condition described as status lymphaticus, which condition he testified could not be known by the surgeon.

In our former opinion we held that a physician is liable for operating upon a person unless he obtains the consent of such person, if competent to give consent, and, if not, of some one who, under the circumstances, would be legally authorized to give the consent; that in the case of a child of tender years consent must be obtained from the parent or guardian. In addition to the cases therein cited by us, we cite the following: Rolater v. Strain, 39 Okl. 572, 137 Pac. 96, 50 L. R. A. (N. S.) 880; Schloendorff v. Society of New York Hospital, 211 N. Y. 125, 105 N. E. 92, 52 L. R. A. (N. S.) 505, Ann. Cas. 1915C, 581. In these cases the operation was not performed upon a minor, but they support the general proposition that an operation without consent is wrongful and unlawful, and constitutes in law a trespass upon the person and a technical assault and battery. Appellees quote certain excerpts from our former opinion, which, when considered alone, would perhaps justify the conclusion that upon the former appeal this court believed the testimony would support a finding either way on the issue of consent. The evidence was given only sufficient considera-

tion to ascertain that the judgment could not be affirmed on the theory that no other judgment could have been rendered, and we believe the opinion, when considered as a whole, discloses that we were considering whether the issue of consent could be taken from the jury at defendant's behest, and not whether the evidence relating thereto was so conclusive in favor of plaintiffs as to require the setting aside of a verdict if one should be rendered thereon in favor of defendants.

[1, 2] Upon the first trial defendants pleaded only a general denial, but upon the second trial they alleged agency on the part of Mrs. Jesse. The testimony shows conclusively that no consent was given by either of the parents to defendants to operate upon their child. The parents had not seen defendants or communicated with them, and Dr. Moss admitted that he did not obtain their consent. We find, therefore, that the evidence conclusively shows that plaintiff is entitled to recover unless his daughters, Clara and Nettie, or one of them, had the authority, express or implied, to give consent in behalf of the parents to the operation being performed. Dr. Moss relies altogether, as is shown by his own testimony, on permission given him by an agent or agents. At the time the daughters came to him he did not know whether they were even legally in possession of the child; all he knew was that they led him to believe they were legally in possession of her, and that they had authority to have the operation performed. They did not say they had such authority, but they used language from which such meaning would naturally be deduced. "Persons dealing with an assumed agent, whether the assumed agent be a general or special one, are bound, at their peril, to ascertain, not only the fact of the agency, but the extent of his authority; and, in case either is controverted, the burden of proof is upon them to establish it." Baker v. Machinery Co., 84 S. W. 662; Connor v. Bank, 156 S. W. 1092; Corpus Juris, vol. 2, § 665. Had there been no other evidence than that of the parents and Dr. Moss to the effect that no dealings took place between them with reference to Imogene, plaintiff would undoubtedly have made out a clear case of an operation performed upon his infant child without his consent. But the defendants pleaded and undertook to prove agency on the part of Mrs. Jesse, and that such agent had express or implied authority to bind her parents to the performance of the operation.

[3, 4] In order to determine whether agency existed, we must look, not to the acts and declarations of the person assuming to be an agent, but to the transactions between such person and the persons sought to be charged as principals. The only evidence concerning such matters was furnished by the parents. They testified that Imogene was permitted to accompany her sisters to San Antonio to pay them a visit for a week or ten days, and with this purpose in view, and no other, she was placed in the custody of her sisters. They were constituted the agents of the parents, but their authority was very limited. It cannot be contended that such an agency would carry with it the implied authority to take the child to a surgeon and have an operation performed upon her, there being no emergency. Such an agency would carry the implied authority to employ a physician to attend the child if it should become ill and require medical aid, and if an emergency arose which required that an immediate operation be performed in order to save the life of the child, the agent would undoubtedly have authority to employ a surgeon to perform the operation. Where there has been no change in the child's health after its custody was confided to its sisters for a week, it appears to us that the sisters would not have any authority to employ physicians to treat the child and endeavor to improve its health, much less to employ a surgeon to perform such an operation as is involved in the removal of tonsils and adenoids, and requires the use of a general anæsthetic. There is nothing in the relation created by giving the custody of the child to its sisters for a short visit which would imply the authority exercised by them. Let us see, then, if the testimony shows that the parents expressly gave the adult daughters any authority greater than that implied from conferring the custody of the child, and, if so, whether the authority so expressly conferred by words is such that authority to bind the parents to the performance of the operation upon Imogene can be implied therefrom. Mr. Rishworth testified on cross-examination what he expected of his adult daughters in regard to Imogene, but so far as instructions are concerned, it appears that the only instructions he gave was that if anything got the matter with Imogene, to let them know at once, and they would be down. He afterwards stated that he distinctly told Clara that if Imogene needed medical attention to let them know at once. He said he meant if she met with any kind of accident, to let them know by wire. This testimony does not disclose that any instructions were given from which the authority to permit an operation could be deduced. So far as Mrs. Rishworth is concerned, it appears that the only instruction she gave Clara was that if anything happened, she must know it at once, and she stated to Clara in this connection that she would, in such event, be down on the next train and bring Dr. Bell, and for her not to trust any San Antonio doctor or any one else. Surely this statement to Clara conferred no express authority to employ a surgeon to operate on the child, nor did it confer any authority from which could be implied authority to have an operation performed.

It appears, however, that appellees rely most strongly upon Mr. Rishworth's testimony with regard to what he expected of Mrs. Jesse, although there is nothing in the record to show that these expectations were made known to Mrs. Jesse, and therefore it is impossible that authority of any kind could be implied therefrom. "The authority of an agent, and its nature and extent, where these questions are directly involved, can only be established by tracing it to its source in some word or act of the alleged principal." Mechem on Agency (2d Ed.) § 285. But if such expectations had been made known to the daughters, we think they showed no more than would ordinarily be expected of a custodian, especially when considered in connection with the fact that their agency was so limited that they were not even intrusted with Imogene's money or with authority to draw on Mr. Rishworth for her benefit, but Imogene was given such authority. Mr. Rishworth testified on cross-examination that he expected Mrs. Jesee to see to it that Imogene was provided with proper food and lodging and everything she needed. He did not expect her to go to a hotel or boarding house. He trusted Mrs. Jesse to give Imogene proper care and attention. Surely if he had stated these things to Mrs. Jesse, she could not imply therefrom that he authorized her to take Imogene to a surgeon and have adenoids and tonsils removed, and especially when Mrs. Jesse knew her parents were opposed to any such operation, and knew they had even refused to give their consent to an operation upon her (Mrs. Jesse) for appendicitis.

Appellees say that if the child had developed a toothache, or stuck a nail in its foot, or broken an arm, or developed fever, it would have been the right and duty of Mrs. Jesse to have engaged competent medical attention. This power would doubtless be incident to the custody, being usual and necessary to adequately dicharge the duties of custodian, but in this case nothing happened to make any change in the health of the child, no duty devolved upon the custodian to seek to improve its health, and especially by exercising authority of a very unusual and extraordinary nature. Appellees, apparently fearing that the illustrations furnished in their brief fail to meet the facts of this case, go a step further and argue that the authority to see that Imogene had everything she needed carried with it the authority to provide what the agent deems is reasonably needed. As before pointed out, neither daughter was told to see that Imogene had everything she needed, but the father, on cross-examination, stated he expected Mrs. Jesse to do so. However, suppose he had stated such expectation to Mrs. Jesse. It is plain that he expected Mrs. Jesse as hostess to provide food and shelter for her guest, and expected her to see that her guest had such other things as she might need. He evidently did not expect her to have an operation performed which he and his wife both opposed, but merely expected her to see that Imogene had the usual and ordinary things necessary for her to live comfortably and safely while paying the visit. The authority to see that Imogene had everything she needed might empower the custodian to provide what she deemed reasonably necessary in order to properly and faithfully discharge her duties as custodian, but not to exercise such unusual and extraordinary power as was exercised by Mrs. Jesse in having such an important operation performed upon the child permitted to visit her.

We conclude that the appellees wholly failed to show that the adult daughters, or either of them, had any authority, express or implied, to have the operation performed upon Imogene.

In their brief, appellees contend the jury was not required to believe the testimony of the parents, because they were interested parties, even though such testimony should be uncontradicted, and they point to certain portions of the testimony relied upon by them as justifying the jury's failure to believe the parents' testimony. The fact that the parents did not in person give any consent to the performance of the operation does not depend alone upon their testimony, for it is admitted by Dr. Moss. The jury was bound to accept that fact as proven, and plaintiff was entitled to recover unless the defendants showed that the authority of the agents was sufficient to empower them to have the operation performed. If the testimony of the parents be discarded, where is any testimony to which appellees could point as sufficient to discharge the burden placed upon them by law of showing that the persons upon whom they relied in fact had authority to bind the parents. But, in addition, the testimony criticized is all consistent with the theory of the plaintiff and the testimony of the parents, to the effect that Imogene was only confided to her sisters in order that she might make them a social visit. Appellees also point to the fact that the plaintiff did not place Mrs. Jesse upon the witness statnd, and did not question Nettie about the extent of the authority of herself and Clara. They contend this is a circumstance reflecting upon the credibility of the parents' testimony, under the rule that when a party has evidence and fails and refuses to produce it, the presumption arises that it would not benefit such party. They say the failure to interrogate the daughters is suggestive to the jury that their testimony would have been against plaintiff on the issue of their authority. On the other hand, it can be said that the failure of principals to put the assumed agents on the stand is suggestive that, had they done so, the testimony would have disclosed want of authority. It would be profitless to discuss which side the daughters would be most apt to favor. The fact remains that the party relying upon the authority of an agent has

the burden of showing it, and if defendants, on account of relationship of the agents to the plaintiff, were afraid to put them on the stand, they are just as unfortunately situated as if the daughters had testified against them, because there is no other testimony to which they can point to substantiate their claim that the daughters had the necessary authority.

[5] We find no claim in appellees' brief that Dr. Moss was justified by apparent authority, but we find it pleaded and mentioned in the charge, and will therefore briefly discuss that phase of the case. Was Dr. Moss led by the special circumstances reasonably to believe that the authority existed in that particular case, and did he act upon that belief in a way that he will be prejudiced if the authority be denied. "It is indispensable to keep in mind here that, as against the principal, there can be reliance only upon what the principal himself has said or done, or at least said or done through some other and authorized agent. The acts of the agent in question cannot be relied upon as alone enough to support an estoppel. If his acts are relied upon, there must also be evidence of the principal's knowledge of and acquiescence in them." Mechem on Agency (2 Ed.) vol. 1, § 725. In this case Dr. Moss did not rely upon any act of the parents of the child, for he did not know of any such act. He did not know whether the daughters were legally in charge of Imogene or whether they had taken her from the custody of the parents without permission. This was the first instance in which Clara and Nettie Rishworth had dealt with him with reference to Imogene, and he had nothing to go on but the fact that they assumed to have the custody of the child and he presumed they had authority to have an operation performed. Their assumption did not justify him, and his presumption that they had authority cannot protect him. Had he known that the parents permitted their little girl to visit her sisters, he could not say that, from the fact that the adult sisters had possession of the child, he was authorized to infer that they had authority to employ him to remove the child's adenoids and tonsils, even though he knew they had been in training to become trained nurses, and that the parents very properly might invest them with authority to employ medical assistance. Agency for a certain purpose cannot be inferred from the mere fact that the person assuming to be agent would make a suitable agent for such purposes. Besides, the authority of an assumed agent to have an operation performed upon a girl 11 years old for removal of adenoids and tonsils under general anæsthesia is of such unusual and improbable character when the parents are living that the person sought to be employed by such assumed agent should refuse to perform such an operation unless he has information from the parents that the necessary authority has been given by them. The fact that parents are not present when an operation is to be performed upon a little child is a circumstance sufficient to arouse inquiry as to whether they know the operation is to be performed.

The first assignment is sustained.

[6] By the second assignment complaint is made in general terms of the testimony of expert witnesses with regard to the advisability of performing the operation at the time it was done. We are not informed by the assignment what witnesses' testimony is complained of. We find that all of appellant's bills of exception were filed after the time allowed by the court had expired, and therefore they cannot be considered. Unknown Heirs of Criswell v. Robbins, 152 S. W. 210; Loeb v. T. & N. O. Ry. Co., 186 S. W. 379. The assignment must therefore be overruled. However, all of this testimony should have been excluded; there being no evidence of any express or implied or apparent authority. The condition of the child's health, and the advisability of removing tonsils and adenoids, could not justify want of authority; no emergency being alleged and proven.

[7] By the third assignment complaint is made of that portion of the court's charge defining implied authority and apparent authority. The objection embraced in the first proposition is to the effect that there was no evidence of express or implied consent or authority, and therefore the charge should not have been given. This is correct, and we sustain the assignment.

[8] The further objection is urged that the charge should not have submitted any issue of implied or apparent authority, without stating specifically that it must be predicated upon the acts or conduct of the party to be bound. If this was omitted, it was appellant's duty to supply the omission by special charge.

[9] The fourth assignment complains of the failure to give several paragraphs of charge No. 2, requested by plaintiff, and the fifth assignment complains of the failure to give the fifth paragraph of special charge No. 1. Complaint cannot be made of the failure to give portions of special charges, for if any part is erroneous, the court can ignore it altogether. No proposition is submitted under these assignments, and it is evident the assignments themselves cannot be considered as propositions. It also appears that the bills of exception showing the presentation of these charges were not filed in time, and cannot be considered. The assignments are overruled.

The sixth assignment raises the issue of the sufficiency of the evidence to support the verdict, and is sustained for the reasons given in sustaining the first assignment.

The judgment is reversed and the cause remanded.

## On Motion for Rehearing.

It is contended that plaintiff's cause of action must find its basis in our death statute, and that no other judgment could legally have been rendered than the one appealed from, the theory being that appellees were not guilty of wrongful acts such as would have given Imogene Rishworth a cause of action had she survived the anæsthetic and the operation, and that, therefore, under article 4695 (R. S. 1911) her parents have no cause of action.

[10] At common law the parent could recover for loss of services of a child, when deprived of such services or part thereof by injuries not resulting in death. Railway v. Brick, 83 Tex. 526, 18 S. W. 947, 29 Am. St. Rep. 675. It also appears that if death did not result at once, or practically so, suit could be maintained for expenses incurred and loss of services between date of injury and date of death. Note, 41 L. R. A. 807. When death resulted instantaneously, or practically instantaneously, no action would lie. Railway v. Beall, 91 Tex. 310, 42 S. W. 1054, 66 Am. St. Rep. 892, and note, 41 L. R. A. 807. True, the courts of some states declined to follow a distinction based upon no satisfactory reason, but in view of the decision in the Beall Case we conclude that plaintiffs herein had no action at common law, and must rely upon the death statute.

[11] We come, therefore, to the test whether administering chloroform and operating upon Imogene Rishworth under the circumstances shown in this case constituted a wrongful act towards her, which, had she survived, would have given her a cause of action against appellees. This matter was discussed in our opinion upon the first appeal and also in our former opinion upon this appeal, and we stated our conclusion that consent to such acts by a child of the tender age of Imogene Rishworth would not be binding upon her, and must be treated as no consent at all. Knowledge of the effect of anæsthetics and surgical operations and the dangers incident thereto cannot be placed upon a parity with knowledge of everyday dangers plainly apparent to the mind of even a child. Had Imogene survived the anæsthetic and the operation, she would have had a cause of action. The extent of her recovery would have been dependent upon the extent of the injurious consequences resulting from the wrongful acts, but whether her damages would have been nominal or great is not a proper subject of inquiry, for the cause of action given the parents is not dependent on a determination of such inquiry. Appellees contend, virtually, that we are not only wrong in holding as a matter of law that Imogene's consent was a nullity, but that we should hold as a matter of law that her consent would have been binding upon her had she lived, and that she could not have contended that any wrongful act was committed by appellees. We conclude there is no merit in the contention that the parents have no cause of action.

[12] It is also contended that plaintiffs failed to prove any damages recoverable under the rules of law applicable thereto. They say the sums paid out by plaintiffs for funeral expenses, etc., could not be allowed, because there was no proof that the amounts charged were reasonable. This contention is sustained by our decisions. Railway v. Rowell, 92 Tex. 150, 46 S. W. 630; Wheeler v. Railway, 91 Tex. 356, 43 S. W. 876; Railway v. Willis, 117 S. W. 170; Railway v. Hemphill, 58 Tex. Civ. App. 232, 125 S. W. 340; Railway v. English, 178 S. W. 666.

[13] They say that the evidence would not support a verdict of pecuniary loss, because no evidence was adduced of the cost of the support and maintenance of the child, and therefore the jury had no basis for estimating the difference between the value of her services and the cost of support and maintenance. This contention is without merit. We have found no decision by our Supreme Court which requires any more exact character of proof with reference to cost of support and maintenance than the pecuniary value of the services. An expert might indulge in extensive calculations on either subject, taking into consideration probable changes in value of services and cost of support during the many years to be taken into consideration, but our Supreme Court has expressed the opinion that the jury can make the estimate just as well as the expert, and that these matters are not susceptible of accurate proof, and therefore must be left to the jury. Brunswig v. White, 70 Tex. 504, 8 S. W. 85; Railway v. Measles, 81 Tex. 474, 17 S. W. 124. The liberal rule announced in said cases has been often followed, and in many cases verdicts upheld upon testimony not as full as that in this case. Railway v. Yarbrough, 73 S. W. 845; Railway v. Bolen, 61 Tex. Civ. App. 339, 129 S. W. 860; Waters Pierce Oil Co. v. Deselms, 212 U. S. 159, 29 Sup. Ct. 270, 53 L. Ed. 453. We, therefore, overrule the contention that the evidence would not support a verdict for plaintiffs.

[14] Appellees contend, further, however, that if the jury could find either way on the issue of proximate cause or damages, we must overrule assignments 1 and 6, which question the sufficiency of the evidence. This is correct; and, while we find that the testimony conclusively shows that the wrongful acts were the proximate cause of the child's death, we are unable to find that the jury was bound to return a verdict for some amount of damages. The very fact that the jury is given so much latitude in applying their own knowledge to the facts proven, considered in connection with the testimony regarding Imogene's health, makes it impossible to say that they were required to allow some damages as the net estimates of the

difference between the value of services and the cost of support and maintenance. Practically speaking, we do not believe a jury would find that the cost of support and maintenance would exceed the value of services, but it is, of course, a question of fact in each case, and on account of the wide latitude given the jury, it would be difficult to question its verdict. In this connection it is to be noted that our courts have decided that the death statute limits the recovery to actual damages, to damages purely pecuniary and compensatory, and that the doctrine of nominal damages does not apply. McGown v. I. & G. N. Ry. Co., 85 Tex. 289, 20 S. W. 80; Rader v. Railway, 137 S. W. 718. The contrary view expressed in Brunswig v. White, supra, has never, as far as we find, been expressly overruled, but we take it that the law is now settled in favor of the conclusion stated in the McGown Case. In view of the foregoing, we conclude that we erred in sustaining assignments 1 and 6.

[15] However, we also sustained the third assignment, which complained of the charge of the court. It is contended that the portion of the charge complained of was only a definition, and was abstractly correct, and that no injury resulted therefrom. It is true it is a definition, and that it is not applied to the facts, but it is expressly stated that it is to be used as the law to determine the issue of consent. It may be correct, but is not clear, and would undoubtedly be accepted by the jury as a clear intimation that the case turned on the question of implied authority, and that the court considered that issue to be in the case. It is true that plaintiffs objected to submitting the issue of consent, but they also objected to submitting any issue of implied authority. They should have briefed an assignment complaining of submitting the issue of consent, but their failure to do so does not deprive them of relying on an assignment complaining of submitting any charge relating to implied authority, which complaint is based on an objection that there was no evidence justifying such a charge. They might be willing to risk the finding of a jury on whether they consented or not, but unwilling to risk its verdict on implied authority of an agent. We conclude that we did not err in sustaining that assignment, and, in view of such assignment being sustained, it is immaterial whether the verdict of the jury might possibly have been rendered for defendants on the theory that no pecuniary loss was proven. It is highly probable that it was rendered on the theory that the evidence showed implied authority, and highly improbable that it was rendered on the theory that the testimony showed no damages. We deem it unnecessary to add anything to our discussion of the evidence, having implicit confidence in the correctness of our conclusion that the evidence conclusively shows that no consent was given, and does not tend to raise any issue of implied authority on the part of the adult sisters to have the operation performed. The error in the charge complained of is material, and requires the reversal of the judgment.

[16] Here, again, we are met by a contention that such error was invited by plaintiffs, by asking a special charge in which a definition of implied authority is given. It is true that plaintiffs, in their second special charge, discourse on what constitutes implied authority, but it is merely an argument leading up to the real request found in the concluding portion of the charge, which is that a peremptory instruction be given because the evidence fails to show consent or implied authority on the part of the adult sisters to have the operation performed. The definition, if it can be called one, of implied authority given in said special charge differs so radically from that given by the court that it cannot be contended the court based his charge thereon, and there is nothing in the record to indicate that the court did not prepare his charge in the very words used by him, and submit it to the parties and that they then prepared objections and special charges. Such is the course contemplated by articles 1971 and 1973, R. S. 1911, as amended by the Thirty-Third Legislature (Acts 33d Leg. c. 59, § 3 [Vernon's Sayles' Ann. Civ. St. 1914, arts. 1971, 1973]) and there is nothing in the record to indicate that it was not followed. We see no good reason why, after objections to admitting an issue have been made and overruled, a party should not submit his theory as to the proper wording of such issue, and are not prepared to hold that thereby he waives his objection to the submission of the issue, but in this case it is clear that the part of the special charge relied on was not even submitted on that theory, but as an argument to the court to give a peremptory instruction. Specific objections were made to the charge of the court in writing, and the court appended thereto a statement over his signature that the objections were presented before the charge was read to the jury and overruled. This was sufficient to entitle plaintiffs to urge their objections by assignment of error. Railway v. Dickey (Sup.) 187 S. W. 184. In addition, it is persuasive that the court did not overrule the objections because of any special charges requested, for he would likely have said so. We conclude that the contention, that of invited error, must be overruled.

We wish to state, in justice to appellants, that we believe we were in error in construing their first special charge as a request for the submission of the issue of consent. Upon further examination, we conclude that paragraph 5 thereof evidences an intention to inform the jury that, when an operation is performed without consent, the parties would be liable regardless of whether it was

skillfully performed or what preparations the operating room was supplied with. It is true the language is appropriate for submitting the issue whether the operation was performed without the knowledge of plaintiff or his wife, or without the consent of either, but in preceding paragraphs of the charge the jury is told that the evidence shows that they had no knowledge that the operation was contemplated, and that there was no evidence of consent; in fact that the evidence showed they had refused their consent. The charge is not well drawn, but, construing it as a whole, we think it shows that plaintiffs were not asking for submission of the issue of consent, and this is emphasized by their written objections.

What we have said renders it unnecessary to consider the objections urged in the motion to the sufficiency of assignments of error Nos. 1 and 6. They are both defective as pointed out, but each has been sufficient to direct attention to the error complained of, and we believe that under the amendment to article 1612 made by the Thirty-Third Legislature in chapter 136 (Vernon's Sayles' Ann. Civ. St. 1914, art. 1612) they are sufficient.

The motion for rehearing is overruled.