## WEST LUMBER CO. v. NASH.   (No. 8236.)

(Court of Civil Appeals of Texas.   Galveston.
June 13, 1922.)

1. **Corporations** ⇐519(3)—**Evidence held not to show that corporation employed doctor to care for an injured employee.**

Evidence *held* insufficient to show that corporation, or any person by its authority, employed a doctor to care for an injured employee.

2. **Principal and agent** ⇐19, 119(1), 147(2) —**One dealing with assumed agent is bound to ascertain extent of authority; burden of proof is on one relying on agent's authority.**

One dealing with an assumed agent of another is bound to ascertain the fact of agency, and also the extent of such agent's authority, and where either fact is controverted the burden of proof is on the one relying on such agency.

Appeal from Houston County Court; Nat Patton, Judge.

Action by C. C. Nash against the West Lumber Company. Judgment for plaintiff, and defendant appeals. Reversed, and rendered.

J. A. Platt, of Houston, for appellant.

B. F. Dent and Earl P. Adams, both of Crockett, for appellee.

LANE, J. This suit was instituted by appellee, C. C. Nash, against appellant, West Lumber Company. Plaintiff, Nash, alleged that on or about the 29th day of October, 1920, the West Lumber Company requested and employed him to treat and give medical attention to one Willis Sneed, to perform an operation upon Sneed, and to provide him with a room and attention in his (Nash's) sanitarium; that he (Nash) is a physician and surgeon, and that upon said request and employment he rendered medical services to Sneed, and provided him with a room in said sanitarium, for which he (Nash) made a charge of $306.40, and that he demanded payment of such charge from West Lumber Company, and that such demand had been refused. The account sued upon, which was attached to the petition as Exhibit A, is as follows:

Palestine, Texas, 1/25/21.

West Lumber Co., Latexo, Texas, services rendered Willis Sneed, to Dr. C. C. Nash, Dr., First National Bank Building.

| | |
|---|---|
| Room in San 10/29/20 to 11/27/20, inclusive, 30 days @ $4 per day | $120 00 |
| Anæsthetic and operating room | 20 00 |
| Laundry, $3.00; pressing, $2.50; L. D. 'phone, $.90 | 6 40 |
| X-ray | 10 00 |
| Fee for operation (laminectomy) | 150 00 |
| **Total** | **$306 40** |

Defendant, West Lumber Company, answered by general demurrer and by general denial. It also specially denied that it, or any one by its authority, had employed the plaintiff to render any service whatever to Sneed. The case was tried before the court without a jury, and judgment was rendered for plaintiff, C. C. Nash, against defendant, West Lumber Company, for the sum sued for. The West Lumber Company has appealed.

[1] Appellant contends that there was no evidence to support the judgment rendered, in that there was no evidence that it, or any person by its authority, employed appellee to perform any service for Willis Sneed. The theory upon which appellee predicates his right to the judgment rendered is that, after Willis Sneed had been at his sanitarium for two days, one H. L. Reynolds called him over the telephone and told him that he was speaking for West Lumber Company; that Reynolds told him to go ahead and do what he could for Sneed, and that "they would pay his bill."

The controlling issue presented for our decision therefore is: Was there any evidence to support a finding that H. L. Reynolds was in fact authorized by West Lumber Company to employ Dr. Nash to perform the alleged services for Willis Sneed, or did said company knowingly permit H. L. Reynolds to perform services for it, within the knowledge of Dr. Nash, which would reasonably lead Nash to believe that Reynolds had the authority to employ him to perform the alleged services for Sneed?

The appellee, Nash, testified that he is a physician and surgeon; that he has a sanitarium in Palestine, Tex.; that on the 28th day of October, 1920, he was returning from Houston en route to Palestine, and that, when the train on which he was traveling reached the village of Latexo, the brakeman on said train told him that some people were putting a negro, who had been shot, on the train to be taken to his sanitarium for attention; that he went and examined the negro, and that when they reached Palestine he hired some one to take the negro to his sanitarium; that he found that the negro, who proved to be Willis Sneed, had been shot, and that the bullet was lodged in his spine; that he operated on the negro; that he gave him the best attention for 30 days, and during that time furnished him with a room in his sanitarium, and that the itemized account attached to his petition shows a true statement of the services rendered Sneed; and that such charges are true, just, and reasonable charges for the services rendered to Sneed by him. He testified further, as follows:

"In a day or two after Sneed was brought to my sanitarium, I had a telephone call from a Mr. Reynolds at Latexo, Tex., who represented that he was speaking for the defendant,

West Lumber Company, and this party wanted to know how Sneed was doing, and after giving him such information as I had with regard to Sneed's condition, this party, who stated his name to be Reynolds, said: 'Go ahead and do what you can for Sneed, and we will pay your bill.' I had only the one conversation regarding the payment of this account, and upon this conversation with Reynolds I base my claim against defendant in this case. It would be unreasonable to think that I would have kept this patient for 30 days without assurance that I would be paid, and I never dreamed but that West Lumber Company was going to pay the account until I got a letter from them, dated November 22, 1920, in which they advised me that they were not responsible for this account. Statement of this account was mailed by me to West Lumber Company about the 29th day of November, 1920, but the bill is still unpaid. West Lumber Company refused to pay the bill."

Cross-examined: "I wrote this letter, dated November 29, 1920, to West Lumber Company; that is my signature, and in that letter I wrote them that Mr. Reynolds had informed me over the phone to do whatever I thought was necessary for the negro and they would see that I was paid. That is correct, and the statement made to me over the phone. I understood from the conversation that West Lumber Company would see that the bill was paid; that was the sense of it. 'Would take care of the bill' was what I understood; that West Lumber Company would stand for the bill. I never had but the one conversation with any one claiming to be the representative of West Lumber Company about the payment of this bill. That was the time I talked to the man who gave his name as Reynolds. I did not know H. L. Reynolds; had never had any dealings with him that I knew of. Sneed remained at my sanitarium for about 30 days, when some of his people carried him away to his mother's."

Redirect: "I cannot give the exact language of the conversation which passed between Reynolds and me over the phone, as I can't remember it now. I can't give it substantially, only that it left the impression on me that West Lumber Company was going to pay this account; that was the sense of it as I understood the matter; that they were going to pay me. My recollection is that Reynolds said: 'Go ahead and treat Sneed, and we will take care of the bill.'"

Recross: "I do not know the difference between a promise to see that I was paid and a direct promise to pay the bill themselves. I thought it all meant the same thing. I did not know Reynolds, that I was talking with, and did not know in what capacity he was employed by West Lumber Company."

Plaintiff offered in evidence the following letters:

"Latexo, Texas, Nov. 22, 1920.

"Nash's Sanitarium, Palestine, Texas—Gentlemen: Attention Dr. Nash. Dr. Heard was in our office this afternoon, and stated to us that he had recently received a letter from you, in which you had made the statement that we were responsible for the hospital account of Willis Sneed, now a patient at your sani-

243 S.W.—45

tarium. We are quite positive that we did not O. K. this account, and we wish to advise you at once that we are not responsible for it at all. While we would want to see you get your money, and if we can lend any reasonable assistance towards helping you get it we will be glad to assist you, but we could not be responsible for such an account. For your information we will say that it is our understanding that Willis Sneed's friends here at Latexo intend making up the money to settle the bill. Willis and his brother can best tell you about this.

"Your truly,　　　West Lumber Company."

"Latexo, Texas, Dec. 1, 1920.

"Dr. C. C. Nash, Palestine, Texas—Dear Sir: We are in receipt of your letter of the 29th ultimo, inclosing statement of the account of Willis Sneed. With reference to your statement that our Mr. Reynolds advised you over long-distance telephone that the West Lumber Company would be responsible for this account: Our Mr. H. L. Reynolds, the bookkeeper here, talked to you some two or three times at the request of Willis Sneed's brother, talking for his brother, who paid the long-distance call. He is positive, however, that he never took upon himself the responsibility to assure you that the West Lumber Company would see that this account would be paid. Our Mr. H. D. Reynolds, superintendent of the plant here, asserts that he has never talked to you at all. As soon as Dr. Heard told us that you were under the impression we would be responsible for this account, we immediately notified you to the contrary, in order that you could correct this impression. As intimated in our letter to you of November 22d, we are under the impression that Willis Sneed's friends here intended making up money to apply against this account, and we have heard some sentiment to this effect among the colored folks here. We might suggest that you write C. G. Jennings, Latexo, Texas, who is one of the leading negroes here, and who took an active part in rushing Sneed off to your sanitarium.

"Yours truly,　　　West Lumber Company."

The evidence shows that at the time Willis Sneed was shot he was an employee of West Lumber Company, but when shot was not in performance of work for said company.

Monroe Johnson testified as follows:

"I work for West Lumber Company at Latexo, and at present am making ties for them. I have been working for them since they have been at Latexo. I knew Willis Sneed, and remember when he was shot. I went to Palestine with him the night he got shot. We got to Palestine early in the morning. At that time Mr. Buck Reynolds was superintendent of the mill at Latexo, but he was not at Latexo that night. When he was away, any business transacted at the office was through Mr. H. L. Reynolds. In the absence of Mr. Buck Reynolds, those having business transactions with the company would take them up with Mr. H. L. Reynolds at the office. He transacted the business. I talked to Dr. Nash very little when I went to Palestine."

Cross-examination: "The business transac-

tions which Mr. H. L. Reynolds performed were keeping the books and paying off the hands. The only business that I ever transacted with him was when he would pay me for my work, and sometimes, if I wanted to borrow a little money, he would let me have it. I don't know of anything that he did, except keep books, pay off, and loan me a little money sometimes. If he ever transacted any other character of business for the company with other parties, I don't know it. I went to my foreman for instructions as to my work. We had a company doctor, paid by the men. The company would hold out of the wages $1.50 per month for men with families and $1 per month for single men, as doctor's fees. They didn't ask me if it was all right to take this out of my wages, but knew that this would be done when I went to work there, and it was understood by all the employees. The company doctor is Dr. Heard, and he went to see Willis Sneed right after he was shot. He also got a colored doctor from Crockett, and later in the night we took Sneed to Palestine to Dr. Nash."

J. O. Sims testified:

"I knew the superintendent at the mill; his name was Buck Reynolds. I also knew H. L. Reynolds, who did the office work; was bookkeeper and timekeeper. When Buck was away, I don't know of my own knowledge who had charge at the mill. I was about the mill a great deal. The superintendent was gone a great deal. Sometimes he would be away three or four weeks at a time. I never knew of a new superintendent coming there to take his place when he would be away. I don't know who did the superintendent's work when he was away. I didn't see Buck Reynolds, the superintendent, the night Sneed got shot."

H. L. Reynolds testified:

"I reside at Latexo and am employed as bookkeeper for the West Lumber Company. I was occupying the same position during October and November of last year. Buck Reynolds was at that time superintendent at that mill. I remember that Willis Sneed got shot about the night of October 23, 1920. Some of the negroes came to me after he was shot and asked me to phone Dr. Nash that they were bringing Sneed to his sanitarium on the train early next morning, and wanted me to advise Dr. Nash, so that he would arrange to take care of Sneed at the sanitarium. I tried to get Dr. Nash over the phone, but learned that he was in Houston, and would return to Palestine on the same train with Willis Sneed, and so advised Sneed's friends. There was only the one phone at Latexo, and it was in my office. I had charge of the long-distance phoning from that point. All long-distance messages to or from Latexo had to go through that phone, and I had charge of that, and kept up with it. In a day or two after Sneed went to the Nash sanitarium, Sneed's brother came to the office and asked me to get Nash's sanitarium and learn how Willis Sneed was getting along. I finally got the sanitarium, and they told me about Sneed's condition, which information I imparted to Willis Sneed's brother. Nothing was said during that or any other phone conversation about West Lumber Com-

pany paying the bill. A few days later I again phoned to the sanitarium about Sneed at the request of Dr. Heard, the company doctor. He had administered first aid to Sneed, and seemed anxious to know how he was doing, and requested me to phone about him. Nothing was said during this conversation about who would pay the bill for Dr. Nash's services. I don't know who I talked to, but to a man both times. I am the only one that phoned from Latexo about Willis Sneed. I attended to the phone, and know that, if Dr. Nash talked with any one over the phone at Latexo, it was me. The superintendent of the mill did not talk to Dr. Nash, but I did that talking from the Latexo end of the line. I did not tell Dr. Nash or any one else that West Lumber Company would pay Sneed's bill at the sanitarium, nor that the company would see it paid; nothing to that effect. Payment of the bill was not mentioned at any time. I heard Dr. Nash testify. He is mistaken, as I am positive that nothing was said in either of those phone conversations about payment of the account. I had no authority to employ Dr. Nash, or any one else, to operate on and care for Willis Sneed, at the West Lumber Company's expense. I was not authorized by West Lumber Company to employ Dr. Nash or any one else. I never did attempt to employ him to perform services of any kind. I never employed any doctor to render services to West Lumber Company's employees. I did not employ Dr. Heard, or any other doctor. That would not have been in the scope of my authority. I kept the books, paid off the hands, and looked after clerical work in the office. I did not at any time attempt to bind the West Lumber Company to pay this account of Dr. Nash for services rendered to Willis Sneed, and did not tell him the company would pay or see it paid."

Cross-examined: "I am a cousin of Buck Reynolds, who was superintendent at the mill last year when Sneed got shot. It is a fact that the superintendent would be away from Latexo at times, occasionally for several days, and when he married in the summer of 1920 he was away some three or four weeks. I would not assume charge when he was away. No one took his place when he would be away, and I was not acting superintendent in the absence of Mr. Buck Reynolds. The other foreman and employees about the plant did not come to me for instructions in the absence of the foreman, but if there was any information that I could furnish them from the office, relative to minor things, I would tell them. If a foreman needed to order supplies when the superintendent was away, he came to my office, and I would make requisition on the purchasing agent of the company through the Houston office. The purchasing agent is Mr. McCall, and is in the general office at Houston. If the superintendent was away, and something came up that required his attention, it would just have to wait over until he returned. Usually when he would start to leave, he would leave with the different foremen a list of things he would want them to do. He never did leave me in charge of the plant in his place. When he was away, I was sometimes called on for information from the office regarding minor things, and, if I knew what they inquired about, I would tell them. We have and then

had what we call the company doctor. Dr. Heard is now doing that work. The company collects monthly from each of its employees a doctor's fee, $1.50 for men with families and $1 from single men. Every cent of this goes to the doctor, and the company retains no part of these fees. We do not force the employees to pay this, but if they use the company doctor they are supposed to pay this fee. If an employee should say that he did not expect to use the company doctor, we would not charge him up with the fee. We have had instances of this kind. I have had employees to tell me they preferred other doctors, and that they would not use the company doctor, and under these circumstances we did not charge them any doctor fee. We do not inform a man particularly when he goes to work that this fee for doctor will be charged, but I think that this is fairly well understood. I did not have anything to do with the employment or discharge of the men. I knew Dr. Richie, who worked up there. I knew about him being let out; he was out a few days. I did not put him back to work after some one else had fired him. I did talk to him. He told me he would have to move away, because he was out of work. I advised him not to be in a hurry to move, and advised him he could probably get his job back. He did go back to work in a few days, but I did not re-employ him. I did not employ any of the men. Buck Reynolds was the general superintendent, and was responsible for things there. It is my recollection that Buck Reynolds was there at Latexo the night Willis Sneed got shot. I had never had any doubt about him being there, but I heard that negro, Monroe Johnson, testify a little while ago that Buck was away that night, which raised a question in my mind. This was the first time I had ever heard any one say he was not there the night Sneed got shot. I remember that I started to go to the hotel to tell him about Sneed getting shot, but decided there was no use to wake him up. I am willing to say, and now tell the court, that Buck Reynolds was in Latexo the night Sneed got shot. He was there the day following the shooting also. Buck Reynolds and his wife lived at the boarding house. I wrote the two letters, dated November 22, 1920, and December 1, 1920, addressed to Dr. Nash, and that have been admitted in evidence. I wrote the letter dated November 22d immediately after hearing that Dr. Nash expected West Lumber Company to pay the account of Willis Sneed; did not consult anybody before writing the letter. The superintendent of the mill was in the woods, I think, at the time. He came to the mill later in the afternoon or that night, after I had written the letter. I did not talk to him about the account before writing the letter."

We do not think the evidence supports the judgment rendered. It is not enough to show that H. L. Reynolds was the bookkeeper of the appellant, but to support the judgment the proof must also show that he was authorized by appellant to employ appellee to perform the services for which appellee sues. There is no evidence showing that H. L. Reynolds was authorized by appellant to employ appellee to perform such services, or that he had ever performed any services for appellant which could have induced or did induce appellee to believe that he did have such authority, but, to the contrary, the undisputed evidence shows that he in fact had no such authority.

[2] If it be conceded that H. L. Reynolds told appellee to give Sneed the services performed by him and that West Lumber Company would pay for same, still such employment would not bind said company. It is well settled that those dealing with an assumed agent of another are bound, at their peril, to ascertain, not only the fact of the agency, but also the extent of such agent's authority, and that in case either is controverted, as in the present case, the burden of proving that such assumed agent was in fact such agent, and had the authority to act in the capacity claimed for him, is upon plaintiff. Baker v. Machinery Co. (Tex. Civ. App.) 84 S. W. 662; Producers Oil Co. v. Green (Tex. Civ. App.) 212 S. W. 68, and authorities therein cited. In the case last cited this court said:

"Corporations can be bound by their agents only when acting within the scope of their authority, and those dealing with such agents are not only chargeable with notice of, but, in case of controversy, have the burden of showing, the authority assumed to have been in fact possessed."

Manifestly no such burden was met in the present case. The facts appearing to have been fully developed, under the conclusions reached as above indicated, it becomes our duty to sustain the contention of appellant, and to reverse the judgment of the trial court, and to here render judgment for the appellant; and it is accordingly so done.

Reversed and rendered.