## LUNDELL v. KINDRED. (No. 8528.)

(Court of Civil Appeals of Texas. Galveston.
April 17, 1924. Rehearing Denied
May 8, 1924.)

1. **Principal and agent**  ⟲⟳119(1)—**Plaintiff suing for breach of agreement to insure had burden of proving that person with whom he dealt had authority to act for defendant.**

In an action for breach of agreement to insure automobile, plaintiff had burden of proving that person with whom he made agreement had authority to act for defendant in the matter.

2. **Principal and agent**  ⟲⟳124(2) — **Evidence held insufficient for submission of question whether agent was authorized to act for defendant in agreeing with plaintiff to insure car.**

In action for breach of agent's agreement to insure automobile, evidence *held* insufficient for submission of question whether agent was authorized to make such agreement.

3. **Principal and agent**  ⟲⟳22(1)—**Declarations of assumed agent not admissible in proof of agency.**

The declarations of an assumed agent are not admissible to prove agency.

4. **Principal and agent**  ⟲⟳23(2)—**Agency may be proved by circumstances.**

Agency may be shown by circumstances.

Appeal from Harris County Court; Murray B. Jones, Judge.

Suit by J. G. Kindred against A. E. Lundell and others, in which named defendant filed cross-action. Judgment for plaintiff against named defendant, and he appeals. Reversed and rendered.

Ball, Merrill & Ball, of Houston, for appellant.

Woods, King & John, of Houston, for appellee.

GRAVES, J. Both sides agree that this statement correctly reflects the nature and result of this proceeding below:

"This suit was instituted by the appellee, J. G. Kindred, against appellant, A. E. Lundell, and H. E. Beck and W. M. Boney, to recover damages for the breach of an agreement to insure an automobile subsequently destroyed by fire. Before trial a dismissal was entered as to Beck and Boney, and the cause of action was prosecuted against Lundell alone.

"Appellant, Lundell, by cross-action, sought to recover against appellee on six certain promissory notes executed by appellee and being each for the sum of $35 with interest at 8 per cent. and stipulation for 10 per cent. attorney's fees, which notes were given in part payment for the automobile which was subsequently destroyed by fire.

"The case was tried before a jury, which rendered a verdict in response to special issues, in favor of appellee; and thereupon the court rendered judgment in favor of appellee for the sum of $600, upon which was allowed a credit on account of the unpaid notes in the sum of $274.10, leaving a net balance in favor of appellee of $325.90."

In this court appellant contends that judgment should have been for him, because there was not sufficient evidence either to justify the court in inquiring whether Boney was authorized to act for appellant in agreeing with appellee to insure the latter's car or the jury in finding that he was.

[1, 2] After a careful examination of the statement of facts, we conclude that this position must be sustained. The evidence is undisputed, and we think clearly fails to bring home to Lundell any responsibility for Boney's acts. The appellee, in making the agreement to insure the car he declared upon, admittedly dealt with Boney alone, and the burden was upon him to show the latter's authority to act in the matter for appellant (West Co. v. Nash [Tex. Civ. App.] 243 S. W. 704; Rishworth v. Moss. [Tex. Civ. App.] 191 S. W. 843; Overton v. Insurance Co. [Tex. Civ. App.] 189 S. W. 514), an obligation he failed to meet.

A full statement of all the material testimony upon the matter is as follows:

"Appellee testified: 'On the 10th day of January, 1921, I resided in Houston, and have resided in and about Houston for several years. At that time I owned a secondhand Overland automobile and wanted to trade it for another and better car and pay the difference in value therefor, and on said date I went to some dealers here in Houston with this in view. That was down here on Louisiana street to the Texas Auto Exchange. Mr. Lundell had his business in the same building, just a door or two apart. I did not know either of these parties at that time, but commenced talking to a man I later learned was Mr. Boney, who was with the Texas Auto Exchange. There was a Reo car in there and this gentleman, whom I learned later was Boney, said that Mr. Lundell had it in there for sale and that he could sell it for Mr. Lundell. We talked trade for some time, and he said he would go in and see Mr. Lundell, and finally he told me that they would allow me $250 for my car on a price of $600.00 for the Reo and let me execute monthly notes at $35 each for the balance of $350. Finally I agreed to this trade, and he went into Lundell's place of business and brought the notes for me to sign. All of these notes are Lundell's, payable to A. E. Lundell Auto Company. They were regular printed notes, payable to Lundell, and I signed them. There were ten of them for $35 each. I have paid these four, but before the fifth became due my car was destroyed by fire. After I had signed these notes Mr. Boney had another conversation with Mr. Lundell and told me that Mr. Lundell would require a mortgage, and also that I insure the car. I did not want any insurance and did not ask for any, but told him if Mr. Lundell required it I would have it insured. He said Lundell required it in order to sell the notes. He then got a mortgage from

---

⟲⟳For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Lundell, and I executed the mortgage to Lundell. Then Mr. Boney told me that they would have the car insured for me, and I could pay Lundell for that. I told him I did not have the money, and he said I could make a note—that it would be about $25. He got another Lundell note, which is this note, and I signed it, due in 15 days. I paid it in 10 days afterwards. After I had executed the notes and mortgage, I took the car and commenced to use it. I came in as the $35 notes were due and paid them to Lundell. He said he had them at the Harrisburg Bank, but that was some distance away, and I could pay him and he would give me a receipt for them and have the bank send me the notes. When I would get the notes I saw that they had been indorsed by Lundell. When I came in in about 10 days to pay the insurance note, I wanted to see Lundell, and he was not in, so I went next door to the Texas Auto Exchange and saw Boney. He told me that he would take it and give it to Lundell the next day, and so I paid this $25 note to Boney, and he marked it paid.

"'After the 8th day of June, before the fifth note was due, the car was totally destroyed by fire. I notified Mr. Lundell about it, and he said he would look for the insurance policy, and after he had looked for it he said he did not have it, and said he guessed Boney had it. I went to Boney, and he said he did not have it, and said that Lundell ought to pay me, and when I would see Lundell he would say that Boney ought to be put in jail, and when I would see Boney he would say that Lundell ought to be put in jail.'

"On cross-examination appellee testified: 'I made the trade with Boney, but Boney went and talked with Lundell. I did not see Lundell or talk with him during this trade, but met him afterwards when I went into his place of business to pay the $35 notes. The car was burned about a mile from Clinton on the Clinton road. I was being towed at the time behind another car. The engine was not running, and I was trying to get it started, so I could go into town. I was going to close up a trade that day and trade in this car for a $700 equity in a place in town. The car was worth about $700 to $750 at the time it burned. I had had a lot of work done on it by a mechanic, and it was in better shape at the time it was burned than at the time I got it.'

"Appellant, Lundell, testified: 'During December, 1920, I had three used cars on hand that I had brought over from A. F. Myers Auto Company at Beaumont, which was being liquidated. I sold them to Beck, the owner of the Texas Auto Exchange, and took his note for $1,000. On January 10, 1921, Boney came into my office and said he had an opportunity to sell the Reo car, and asked me if I would take $350 of Kindred's notes and give the Texas Auto Exchange credit for that amount on the $1,000 note which they owed me. He told me that Kindred had a steady job at Clinton and was good pay. I told him that I would take the notes and give him the credit on the Texas Auto Exchange indebtedness to me, provided Kindred would make the notes payable direct to me and execute a mortgage in my favor covering the car, and take out insurance on the car with the loss payable clause in favor of me. I gave Boney a pad of my blank notes and one of my blank chattel mortgages. Boney

left my office and came back later with ten $35 notes and chattel mortgage signed by Kindred. I transferred the notes at the bank and as Kindred paid the money at the store I would send the money to the bank. I never met Kindred during this transaction, and never saw him in my life until after the car burned up. He paid the $35 notes to my clerk. He came into my office after the fire, and I told him that I had nothing to do with his trade with Boney, and that he would have to look to Boney for it.'

"On cross-examination appellant testified: 'I require cars to be insured, and it is so stated in my mortgages, as used in this sale. These $35 notes were payable to me and were paid to me; but I never had the $25 note, and knew nothing about it. I have not got the note Beck executed to me. I sold him these cars without cash payment and without insurance. I always require others to insure cars, unless they pay cash in full. The mortgage is to me, and I had it recorded. If you or anybody else were to come to my place wanting to buy a car and paid the cash payment and executed notes for the balance, I would require him to insure the car with loss payable to me. I sold three cars to Beck without any cash, taking this $1,000 note in payment, and did not require him to have it insured. It is my rule generally to let them pay me for the insurance and take out the policy and keep it until I am paid. A. E. Lundell Auto Company of Houston, Tex., was a corporation, I was the sole owner, and this was merely my trade name.'

"W. M. Boney testified: 'On January 10, 1921, I was in the employ of the Texas Auto Exchange, which was owned by Mr. H. E. Beck. We had on hand three secondhand automobiles, a Reo, a Dodge, and a Studebaker, which we had bought from Mr. Lundell and had given him for them a note for $1,000. The Reo and Dodge were each worth about $350, and the Studebaker $300. On January 10, 1921, J. G. Kindred came into the Texas Auto Exchange and wanted to trade in a secondhand Overland car for a better car. I showed him the Reo automobile and agreed to make a trade with him for his car and $350 in monthly notes. I told him that I would have to consult Mr. Lundell about this trade, and I went to Mr. Lundell's office, and he said that he would take the notes and give us credit on our $1,000 note to him, provided that we would have the notes made on his stationery and have the chattel mortgage executed in his favor, and have the purchaser insure the car with loss payable to him. I told him that Kindred was good pay and had a good job down at the plant at Clinton. I went back to my office and had Kindred sign up the ten $35 notes on Lundell's stationery and the chattel mortgage. I then told him that Mr. Lundell insisted that he take out insurance with loss payable clause to him. He then said that he did not have the money for the insurance, but that he would have it in a few days, so I took his note for $25 to cover the insurance and agreed to get the insurance. This was on Lundell's notes too. A few days later he came in the Texas Auto Exchange and paid the note, and I receipted it. I never got the insurance.'

"On cross-examination W. M. Boney testified: 'I did talk with Lundell about the trade. He was in the auto business right by us. I got

the notes from him; they were payable to him straight, and I gave the mortgage and all the notes to Lundell, except the $25 insurance note. The mortgage was to Lundell and had a provision in it requiring the car to be insured. I told Kindred this. The insurance note was payable to Mr. Lundell, but I did not give it to Lundell, and it was paid direct to me. The money received by me in payment of this $25 note was not paid to Lundell. Mr. Beck is in New Orleans, so I am told. The Texas Auto Exchange has cars insured for purchasers and retains the policies.' "

It thus undisputedly appears that the litigating parties never met at all until some time after the declared upon agreement to insure the car had been consummated; appellant saying that he never saw appellee until after it had been burned. The direct testimony of both appellant and Boney that the former had previously sold this car and two others to Beck for $1,000, taking his note for the amount, and therefore at the time of the transaction affecting this one having no interest in it, is not contradicted, nor does anything appear from which a legitimate issue as to its truth might be raised; the notes and mortgage involved were in evidence, and none of those contained any recital in any way inconsistent with the nature of appellant's interest, as given by himself and Boney.

[3] Appellee dealt with Boney alone, and the only suggestion the statement of facts contains that the latter was acting for appellant is appellee's own statement about what Boney told him, but the declarations of an assumed agent are not receivable in proof of his agency (Rhodes v. Smith [Tex. Civ. App.] 230 S. W. 227), and in this instance no act or omission of any sort on the part of the alleged principal was shown to bolster them up. Not a particle of testimony in any way connected appellant even with a knowledge of the $25 note Boney took from appellee to cover the cost of the insurance on the car. While it was drawn on his blank form and made payable to him, it is undisputed that he knew nothing of it, and that Boney not only retained possession of and collected it when paid some 10 days after its date, receipting for it in the name of his own firm, but kept the proceeds without procuring the insurance he had promised appellee; unmistakably, therefore, appellee depended solely on Boney's statements to him as to appellant's relation to the matter; and, if they did not truly reflect it, he cannot penalize the latter for the consequences of his mistaken reliance upon another.

[4] It is quite true, as appellee argues in this court, that direct evidence is not indispensable, and that agency may be shown by circumstances, but here, as before pointed out, the circumstances were wholly lacking. The mere act of Boney in selling the Reo car under such conditions to his purchaser as coincidentally permitted him and Beck to obtain from appellant the credit they had so arranged with him for their $1,000 note to him, standing alone certainly could furnish no reasonable basis for a conclusion that appellant must have known that in doing so he had also held himself out to appellee as appellant's agent, and there is an utter absence of anything else.

Neither were there any such relations between Boney and appellant, or such mutual conduct on their part concerning the contract to insure the car, as even inferentially indicated that they were principal and agent for that purpose. Obviously this could not be if appellant had already sold the car to Beck, which he undisputedly had, and there is not a scintilla of evidence tending to show that he ever authorized Boney to make any sort of deal in his behalf with appellee about insurance. On the contrary, all the evidence there is tends strongly the other way. Appellant's chattel mortgage form required the purchaser to insure the car at his own expense, with loss payable in appellant's favor, and this provision he called to Boney's attention when agreeing to accept a purchaser's notes in substitution for what Beck owed him.

Boney was not an employee of appellant, but was connected with Beck, who operated a separate business of his own in an adjoining store, and the only dealing appellant was shown to have had with either of them was his sale to Beck of the three automobiles for his $1,000 note, upon which he subsequently agreed with Boney to enter a credit of $350, provided there was delivered to him the notes of the appellee aggregating a like amount, payable directly to him, and secured by a chattel mortgage and an insurance policy in his favor. It is further clearly shown that this was done to enable appellant to use the notes at the bank.

Appellant's request for a peremptory instruction should have been granted.

In view of this conclusion, the questions raised in the briefs respecting the measure of damages need not be discussed.

The judgment of the trial court will therefore be reversed, and this court's judgment will enter, decreeing that appellee take nothing on his cause of action herein asserted against appellant, and that appellant recover on his cross-action against appellee the sum of $274.10, being the amount found by the trial court to be due for principal, interest, and attorney's fees on the six unpaid $35 notes at the date of the trial below, together with interest thereon at the rate of 6 per cent. per annum from April 10, 1923, the date of the judgment in the court below.

Reversed and rendered.