EARDLEY BROS. v. BURT et al. (No. 5597.)

(Court of Civil Appeals of Texas. San Antonio. Jan. 26, 1916.)

1. MECHANICS' LIENS ⊚⟹199 — PRIORITIES — VENDOR'S LIEN.

A vendor's lien on land sold has priority over a mechanic's lien thereon based upon the drilling of an artesian well for the buyer.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 371–374; Dec. Dig. ⊚⟹199.]

2. MECHANICS' LIENS ⊚⟹59 — "OWNER" OF LAND.

One who has only a contract to purchase land is not the owner thereof within the meaning of the mechanics' lien statutes.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 75, 76; Dec. Dig. ⊚⟹59.

For other definitions, see Words and Phrases, First and Second Series, Owner.]

3. PRINCIPAL AND AGENT ⊚⟹22—ESTABLISHMENT OF AGENCY—DECLARATION OF AGENT.

An agency cannot be established by the statement of the agent.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 40; Dec. Dig. ⊚⟹22.]

4. MECHANICS' LIENS ⊚⟹57 — CONTRACTOR'S DUTY TO INQUIRE.

Where the title to farm lands stood in the name of one other than the trustee for the farms who managed them and contracted for the cleaning and drilling of wells thereon, it became the duty of the contractors for the work to ascertain what rights had been acquired by such trustee.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 64–71, 74; Dec. Dig. ⊚⟹57.]

5. PRINCIPAL AND AGENT ⊚⟹23 — AGENCY — SUFFICIENCY OF EVIDENCE.

In an action for the value of services in cleaning and drilling wells, evidence *held* insufficient to support a finding that the one who ordered the work done was the agent of the owner of the land to contract for the work, or for any other purpose, or that he purported to act as agent in making the contracts.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 41; Dec. Dig. ⊚⟹23.]

6. PRINCIPAL AND AGENT ⊚⟹173—RATIFICATION—SUFFICIENCY OF EVIDENCE.

In an action for the value of services in cleaning and drilling wells, evidence *held* insufficient to show any ratification by the owner of the land of the contracts for the work made by another.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 659–661; Dec. Dig. ⊚⟹173.]

---

⊚⟹For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**7. PRINCIPAL AND AGENT ☜164—RATIFICATION.**

There can be no ratification of an unauthorized contract by a principal binding him, unless the ratified contract was made by one purporting to act as agent at the time.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 622–625; Dec. Dig. ☜164.]

**8. MECHANICS' LIENS ☜76 — ACQUIESCENCE OF UNDISCLOSED OWNER.**

Where the owner of farm lands did not know that a well was being drilled thereon pursuant to contract with one who later purchased the land until the work was in progress, and did not know that the contractors were not fully informed of the facts relating to the title to the land, which, though standing in his own name when the work was contracted for, was conveyed to the person who had contracted for the work prior to its completion, there was no acquiescence in or consent to the work on the part of the record owner such as would affect his rights.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 104–107; Dec. Dig. ☜76.]

**9. MECHANICS' LIENS ☜76 — ACQUIESCENCE OF OWNER.**

Under the mechanics' lien statute, the mere fact that the owner of property acquiesced in or even consented to the furnishing of material to be used on the premises, or the performance of labor, cannot fix liens on the property by one in possession.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 104–107; Dec. Dig. ☜76.]

Error from District Court, Dimmit County; J. F. Mullally, Judge.

Action by A. Eardley and John Eardley, composing the firm of Eardley Bros., against F. S. Burt and another. To review a judgment for the named and against the unnamed defendant, plaintiffs bring error. Affirmed.

Vandervoort & Johnson, of Carrizo Springs, for plaintiffs in error.

MOURSUND, J. A. Eardley and John Eardley, composing the firm of Eardley Bros., sued M. H. Burt and F. S. Burt for the value of services rendered in cleaning out a well and drilling a well on 80 acres of land in Dimmit county, being the west half of the S. W. quarter of section 29, alleging that said land was owned by F. S. Burt and was named "Wonderland Farms" by defendants, and that M. H. Burt represented himself to be trustee and manager of said "Wonderland Farms." The suit was upon two written contracts, which will be copied in stating the testimony. Plaintiffs sought to establish and foreclose a mechanic's lien on said land.

Defendants denied all the material allegations, and alleged that F. S. Burt never joined in the contracts for the work done, that he had no interest therein, and was in no way liable thereon; that M. H. Burt bought the land from O. T. Gregory, who was holding it with the balance of the section for defendant F. S. Burt under an unrecorded deed from the Artesian Land & Irrigation Company, which deed was later recorded, and said Gregory later made a deed to F. S. Burt, who, on November 23, 1912, executed and delivered a deed to the 80 acres to M. H. Burt in consideration of a vendor's lien note dated November 23, 1912, for $4,000, of which amount $1,600 was for borrowed money.

Plaintiffs' first supplemental petition charges that the deed of November 23, 1912, was executed long after the work was completed and was and is, as to them, fictitious and fraudulent; also that if it be true that F. S. Burt had no interest in "Wonderland Farms," that he had full notice and agreed that M. H. Burt might take possession in name of "Wonderland Farms" and improve the same, and that he had taken possession and was improving the same, and F. S. Burt should be estopped from denying plaintiffs their lien thereon.

Defendants replied, to the effect that F. S. Burt had no interest in "Wonderland Farms," except his vendor's lien thereon; that he did not know what improvements had been placed thereon, and did not authorize, acquiesce in, or ratify any improvements that were placed thereon.

The court instructed the jury that plaintiffs were not entitled to recover against F. S. Burt, and that his lien to the extent of $30 per acre was prior to that of plaintiffs. The jury returned a verdict against M. H. Burt for $1,393.50, with foreclosure of mechanic's lien on 50 acres of land, subject to F. S. Burt's lien of $30 per acre. Judgment was entered upon such verdict. Plaintiffs appealed, and by appropriate assignments of error complain of the court's action in instructing the jury that plaintiffs could not recover against F. S. Burt, and in effect that his lien to the extent of the purchase money had priority over that of plaintiffs if they found that plaintiffs were entitled to recover.

In May, 1911, the Artesian Land & Irrigation Company, a corporation of which Asher Richardson was president and M. H. Burt was secretary and treasurer, and which owned about 20,000 acres of land in Dimmit county, entered into a contract with O. T. Gregory, whereby he undertook to sell such land. Defendant F. S. Burt owned stock in the corporation. On June 10, 1911, he surrendered a portion of his stock in exchange for section 29. The deed was taken in Gregory's name, for convenience in selling, and he conveyed it to F. S. Burt by deed dated November 16, 1911, which was not recorded until April 22, 1912. F. S. Burt conveyed to M. H. Burt the 80 acres out of survey 29, described in plaintiffs' petition, by deed dated and acknowledged November 23, 1912, but not filed for record until September 1, 1914. The consideration recited in the deed is $4,000, evidenced by a promissory note, to secure which a vendor's lien was retained in

the deed. Plaintiffs' mechanics' lien was filed December 14, 1912.

The contracts sued upon read as follows:

"Asherton, Texas, May 27, 1912.

"Agreement entered into this day and date above written between M. H. Burt and Eardley Bros. of Carrizo Springs in which the said Eardley Bros. agree to move rig on section 29 on 80 acres now cleared and work on well now there at rate of $15 per day until an agreement is reached as to what is necessary. The said M. H. Burt agrees to give said Eardley Bros. the job of drilling new well if one is necessary and such other wells as he may have drilled on this section.           [Signed]  M. H. Burt."

"San Antonio, Texas, June 17, 1912.

"Contract Agreement.

"This agreement entered into this day and date above written by and between M. H. Burt, of San Antonio, Texas, party of the first part, and Eardley Brothers of Carrizo Springs, Texas, parties of the second part, witnesseth:

"Party of the first part in the capacity of trustee and manager of Wonderlands Farms does hereby employ party of the second part to drill a well for artesian water on the west one-half of the southwest one-quarter of section 29 in the Asher Richardson survey, Dimmit county, Texas. Said well to be drilled to and through both stratas of the water bearing sands known to exist in this section. Party of the first part to furnish all casing necessary to case said well but party of the second part to furnish everything else and drill the well as far as possible as a 8¼-inch hole and finish same as a 6¼-inch. Well to 700 feet or more if necessary.

"For and in consideration of the faithful performance of said work by the parties of the second part the party of the first part hereby agrees to pay said second party the sum of one dollar ($1.00) per foot for such actual depth as the well may measure when completed and accepted by said first party.

"Witness our hand and signatures this day and date above written.
                   "[Signed]  M. H. Burt.
                            "John Eardley."

John Eardley testified:

"I looked to F. S. Burt because F. S. Burt was interested in that land and M. H. Burt was working under F. S. Burt. As to whether I knew that at that time, I would say I know it by M. H. Burt's own talk to me. I think he told me that not a great while before this contract was signed up. He told me that he and his brother was interested in that land, this M. H. Burt was just working for this F. S. Burt. I got that information through M. H. Burt. I could not recall now what Mr. M. H. Burt said to me that caused me to believe that. I might have recalled it if this matter had come up shortly after this work was done, I believe I could have recalled everything, but it had been two years and more since it came up."

He also testified that when he got down to 550 feet he found it advisable, on account of the well caving in, to reduce the hole to 5³/₁₆ inches; but as the contract called for 6¼ inches at the bottom, he got Vaughan, the tenant in possession of the land, to ascertain whether it would be satisfactory to make such reduction in the size of the well; that Vaughan in about four days told him to go ahead, that it would be all right; that F. S. Burt had said so. Vaughan testified that he did not talk to F. S. Burt; that Eardley asked him to talk to M. H. Burt, and he talked to the latter over the telephone at San Antonio, and received the reply that M. H. Burt wanted the well according to contract and the amount of water contracted for, but if he could get the water he might reduce the size of the casing; that he communicated this answer to Eardley. F. S. Burt testified he never had any conversation with Vaughan. M. H. Burt denied having ever authorized the reduction of the size of the well, and testified he had no information that such reduction was contemplated. After the well was completed John Eardley went to San Antonio and had a conversation with F. S. Burt. He testified he asked F. S. Burt for his money, and was told by F. S. Burt that he could not do anything until his brother, M. H. Burt, came back to San Antonio; that he said as soon as his brother returned they would come to Asherton, and in fact named the day they would be there; that F. S. Burt spoke about going 1,000 feet, and witness told him he could not and would not do it at that price; that witness had fulfilled his contract and that after he paid witness for that work witness would make a new contract and go as deep as he wanted to go; that on the day appointed John and Will Eardley met M. H. and F. S. Burt at Asherton and had a conversation with them about the well; that F. S. Burt said they would like to go out and look over the place before they could settle with Eardley Bros., and they would meet John Eardley in Carrizo Springs the next day and settle up for the work on the well; that the Burts did not come to Carrizo Springs the next day, but John Eardley received the following letter:

"W. A. H. Miller, Attorney at Law, Lands & Loans.

"Asherton, Texas, October 3, 1912.

"Mr. John Eardley, Carrizo Springs, Texas— Dear Sir: You seem determined for reasons unknown to us not to complete our well according to contract. We now wish to notify you that unless you start operation at once and finish the well to the second strata of the water sand according to contract without any further delay that you can pull out your 5³/₁₆ casing and remove your machinery from the place at once and we will pay you for the 8¼ casing you put in the well of your own. We will pay you $1 per foot as per contract when you complete the well through the second strata of the water sand and if this is not encountered previous to drilling 1,000 feet we will then pay you $1,000 and enter into another contract providing we want to go any further down at that time but will consider your contract completed when you have drilled 1,000 feet as you advised me at the time of making this contract that you had an outfit capable of going this depth.

"Kindly give me an immediate answer as to what you intend to do in the matter, addressing me at our office in San Antonio, Texas.

                   "Yours very truly,
                        "[Signed]  M. H. Burt."

The testimony of M. H. Burt, F. S. Burt, and Gregory is to the effect that during the latter part of June, 1911, Gregory sold to M. H. Burt the 80 acres of land for $2,400, and reported such sale to F. S. Burt at Wichita, Kan., during the latter part of July, 1911; that F. S. Burt approved the sale and at Gregory's request loaned M. H. Burt $1,000

to improve the land, Gregory having informed him of M. H. Burt's plan to sell "Wonderland Farms" on the unit plan; that in October, 1911, F. S. Burt loaned M. H. Burt $600 more to pay for improvements. Both M. H. and F. S. Burt testified that F. S. Burt had no interest in the 80 acres or in the "Wonderland Farms" enterprise other than his lien for purchase money and loans. M. H. Burt explained his plan as follows:

"My object was to raise onions, and I was already selling the land—I was selling the land out on a unit plan. By that I mean this: A unit was one acre, and when I sold them I sold them on contract and I became the trustee and manager for the man I sold to. When he paid out he had a deed to the acre or 2 acres or 5 acres, and the contract that I had extended for 5 years, that I was to raise onions for him and I got 25 per cent. of the net profits. I sold about 60 acres of those units. * * * "

He explained that he used the expression, "our well," in the letter because he always expressed himself in the plural on account of handling it in units, and representing himself and others in developing the property.

F. S. Burt testified that he had nothing to do with the matter of drilling the well on the 80 acres by Eardley Bros., and knew nothing of it until the latter part of July or August, 1912; that he stated to Eardley he had no interest in the well; that he came to Asherton with his brother because he was interested in seeing a good well on the 80 acres, on account of the effect upon the balance of the land, as well as the value of his lien; that he was to loan his brother $1,000 to pay for the well if it was completed to a depth of 1,000 feet.

[1, 2] Appellants' theory apparently is that the parol sale of the 80 acres to W. H. Burt was not enforceable by him because of the fact that he had not paid the purchase money, and therefore the land should be treated as absolutely owned by F. S. Burt. It is evident that if M. H. Burt was the owner within the meaning of the mechanics' lien statute, the land was incumbered by a vendor's lien for $2,400, which would have priority over the mechanics' lien. But if M. H. Burt only had a contract to purchase, he was not the owner within the meaning of such statutes. Galveston Exhibition Association v. Perkins, 80 Tex. 62, 15 S. W. 633. We will therefore inquire into the question whether the evidence would support a finding that F. S. Burt authorized the execution of the contracts or is liable thereon. There is no testimony from which it can be said that F. S. Burt authorized M. H. Burt to execute such contracts or that he even knew a well was being drilled until the latter part of July or in August, 1912. The only evidence that tends to show that M. H. Burt was agent for F. S. Burt is that of John Eardley to the effect that he knew from M. H. Burt's talk they were both interested in the land, and that M. H. Burt was working under F. S. Burt; that he thought Burt had told him not a great while before this contract was signed up.

[3-6] Aside from the fact that agency cannot be established by the statement of the agent, such statement is far from being one to the effect that M. H. Burt was the agent of F. S. Burt for the purpose of making improvements costing over $700. M. H. Burt represented in the principal contract that he acted in the capacity of "trustee and manager for Wonderland Farms." Eardley Bros. made no inquiry as to the ownership or what the term "Wonderland Farms" stood for. As the title stood in the name of F. S. Burt, it became their duty to ascertain what rights had been acquired by M. H. Burt, trustee, etc., and had inquiry been made it must be assumed it would have developed the fact that M. H. Burt and his unit associates could get no other title than one incumbered with a vendor's lien for $2,400. The evidence would not support a finding that M. H. Burt was the agent of F. S. Burt for the purpose of contracting for the cleaning and drilling of wells, or for any other purpose, or that he purported to act as agent for him in making the contracts. The evidence fails to show any ratification by F. S. Burt of the contracts made by M. H. Burt, and in fact as in such contracts M. H. Burt did not purport to act as the agent of F. S. Burt, there was no acting as agent for him to ratify. Sheer v. Cummings, 80 Tex. 294, 16 S. W. 37.

[7-9] As F. S. Burt did not know the well was being drilled until the latter part of July or in August, and did not know that Eardley Bros. were not fully informed of the facts relating to the title to the land, we think there was no acquiescence or consent on his part such as would affect his rights. In addition under statutes such as ours the mere fact that the owners of the property acquiesced or even consented to the furnishing of material to be used on the premises or to the performance of labor, could not fix liens on the property. Galveston Exhibition Association v. Perkins, 80 Tex. 62, 15 S. W. 633; Faber v. Muir, 27 Tex. Civ. App. 27, 64 S. W. 938. The evidence wholly fails to sustain any theory of liability on the part of F. S. Burt such as is pleaded by plaintiff, and the court did not err in instructing a verdict.

Judgment affirmed.