## KEMPNER et al. v. HUNTSVILLE STATE BANK.   (No. 8739.)*

(Court of Civil Appeals of Texas. Galveston. Feb. 8, 1926. Rehearing Denied Feb. 25, 1926.)

**1. Principal and agent ⨾⇒23(1)—Evidence held insufficient to show that one buying cotton for defendants was their agent, so as to require them to honor draft drawn by him.**

Evidence *held* insufficient to show that one buying cotton for defendants, and drawing draft on them for ginning, insurance, sampling, and weighing, was their agent, so as to require them to honor draft.

**2. Principal and agent ⨾⇒119(1, 4)—Bank, to recover from drawee amount advanced on draft, had burden of showing that drawer's employment was by drawee's authorized agent, and that drawer acted thereunder.**

Bank, to recover amount advanced on draft drawn on defendants by one who was given authority to buy cotton for them by their agent, had burden of proving that drawer's employment was within scope of such agent's authority, and that drawer acted under such employment in drawing draft and obtaining money thereon.

**3. Principal and agent ⨾⇒24.**

Whether acts of defendants and of cotton buyer who drew draft on them created agency *held* question of law for court.

**4. Evidence ⨾⇒568(1).**

Conclusion of witness cannot support findings of fact or judgment.

**5. Principal and agent ⨾⇒170(2)—Defendants held not to ratify cotton buyer's drawing draft by honoring other drafts drawn by him as seller.**

Defendants *held* not to ratify act of cotton buyer as their agent in drawing draft because they had at other times honored drafts drawn by him, where every draft so drawn indicated that he was a seller and not an agent.

**6. Principal and agent ⨾⇒25(1)—Defendants held not estopped from denying agency of cotton buyer who drew unauthorized draft on them by paying previous drafts, not shown on their face to be drawn by buyer as their agent.**

Defendants *held* not estopped to deny agency of cotton buyer, who drew unauthorized draft on them, though he had been buying cotton for them, and they had previously honored drafts drawn by him, where no draft they' ever paid on its face purported to be drawn by him as their agent.

Appeal from Harris County Court; Roy F. Campbell, Judge.

Action by the Huntsville State Bank against I. H. Kempner and others. Judgment for plaintiff, and defendants appeal. Reversed and rendered.

Williams, Neethe & Williams, of Galveston, for appellants.

Vinson, Elkins, Sweeton & Weems, of Houston, for appellee.

GRAVES, J. Appellants' brief statement of the nature and result of the suit is accepted by the appellee as being correct:

"This appeal is taken from the judgment of the county court at law No. 2 of Harris county for the sum of $325.73, with interest thereon from September 30, 1922, rendered in favor of the Huntsville State Bank, appellee, against appellants I. H. Kempner, D. W. Kempner, R. L. Kempner, S. E. Kempner, and J. Seinsheimer, doing business under the trade-name of H. Kempner. The action was brought against appellants and in the alternative against one J. R. Jordan to recover the amount named in the judgment, which the appellee claimed to have advanced or paid upon a draft for that amount drawn on appellants by Jordan, who was alleged to have been an agent for appellants and acting as such in drawing the draft and obtaining the money thereon from appellee; it being further alleged that if in fact Jordan was not an agent of appellants, then appellants had so held him out as such, and had by honoring other drafts drawn on them by him so misled appellant as to be estopped from denying the authority of Jordan to, as their agent, draw the draft in suit. A further statement of the pleadings will be made below. The case was submitted to a jury on special issues, and upon the verdict returned judgment was, on motion of appellee, rendered against appellants, as above stated, Jordan having been by appellee dismissed from the suit."

The further elaboration of the pleadings referred to need not be made; it being sufficient for determination of the appeal to recite that appellants, under oath, denied any connection with or responsibility for the draft in suit, through Jordan or otherwise, asserting that he had neither been authorized to nor did execute any such instrument as their agent, and that they received no money or benefit of any sort therefrom.

In answer to the special issues, which embodied inquiries about those matters, the jury found that L. L. Kelly, about September 1, 1922, for the firm of H. Kempner, made an agreement with J. R. Jordan to buy cotton for Kempner in Walker county and draw drafts on them for the purchase price; that in making such contract he acted within both the actual and the apparent scope of his authority; that the firm ratified and confirmed the contract; that Jordan in drawing the draft for $325.73 acted as the agent of H. Kempner within both the actual and apparent scope of his authority; and that the appellee bank in cashing such draft believed from the conduct and dealing of the Kemp-

---

⨾⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error dismissed for want of jurisdiction April 14, 1926.

ner firm that Jordan was authorized as its agent to draw the draft.

As the summary of its pleadings has indicated, the bank sought to hold Kempners.solely on the theory that Jordan either was their agent in drawing the draft through and getting the money thereon from it, or if not so in fact, that as a result of their conduct they were estopped to deny that relationship to him.

Appellants do not attack the jury's findings as being against the weight of the evidence, but insist only that there was no competent evidence showing either that the draft sued on was drawn by or the proceeds thereof paid to any agent of theirs, or that any acts, omissions, or conduct of theirs estopped them from so saying. This, therefore, is the sole question the appeal presents, and after carefully reviewing the statement of facts, we conclude that appellants are right about it.

[1] The draft involved bore date of September 30, 1922, was for the $325.73, recited "statement attached," and was signed simply "J. R. Jordan." Attached to it was a letter likewise dated, addressed, and signed, reading:

Below hand you statement of ginning, insurance, sampling, and weighing, chargeable to the four shipments as follows, viz.:

| | |
|---|---|
| 31 B/C marked W.L.D. | $ 95 88 |
| 40 B/C marked U.L.D. | 98 46 |
| 65 B/C marked L.O.U. | 11 31 |
| 15 B/C marked T.I.P. | 32 08 |
| | $325 73 |

It will be noted from this statement that the sum the draft evidenced was the aggregate of "ginning, insurance, sampling, and weighing" on four different lots of cotton, amounting to a total of 151 bales, which was otherwise shown to have been shipped the week before to Kempner by Mr. Jordan under drafts for the purchase price thereof, which he had already paid, with bills of lading therefor attached, Kempner having paid the drafts and so gotten the cotton on the bills of lading; so that the draft sued on was exclusively for "ginning, insurance, sampling, and weighing" that accrued at the point of origin—that is, up in Walker county—on this cotton, which had previously been bought there by Mr. Jordan and so shipped to and received at Galveston by Kempner.

Mr. Jordan testified that he was buying the cotton in Walker county for Kempner under an agreement to that effect he made with the latter's representative, Mr. L. L. Kelly, and that in doing so he would, by his own checks on the Huntsville State Bank, pay the sellers the agreed price, less these "ginning, insurance, sampling, and weighing" charges, ship the cotton right on to Kempner under a draft payable to the appellee, with attached bill of lading for the actual amount he had paid out to the sellers, and then on the following week

would get a statement of these charges thereon and make separate draft on Kempners for that, which they always paid; that the transaction here involved was of that character, was carried out under that cotton buying agreement, and this draft was the only one turned down in their business together. He never at any time, however, said that he was the agent of Kempners, but limited his relation to them to the agreement he had through Mr. Kelly to buy cotton for them, and on cross-examination thus defined its terms:

"I was not working on a salary for Kempner. I did not get any commission out of these cotton factors. I made a mistake of working for nothing. A fellow buying cotton has a limit, a price given the same day, and he has got to buy it under that to make anything for himself, deducting the usual loss in weight, which is about six pounds on green cotton early in the season, and a few points of exchange; the bank has to weigh it too; then freight, you know. I would get the limit from Mr. Marquez, which would mean they were offering a certain price for cotton. I would then go and buy cotton from whoever happened to have it for a less price than I sold it to Kempner and make the difference. The limit was the price that Kempner was to pay me for cotton landed at Galveston, which meant that I had to bear the freight to Galveston and other charges against the cotton, and the class and weight should be fixed at Galveston; it was to be delivered to Galveston. When I would buy up cotton under a certain limit, it is a fact that I would take out the bill of lading from the railroad company and would make out an invoice and attach those two documents to a draft on Kempner at the Galveston weights and class. If my draft was more than the cotton was worth after it was classed and weighed down there, I would owe Kempner the difference. I bought cotton for Kempner's account. Kempner did not have anything to do with the price I paid the farmer or other person I got the cotton from. I fixed the price in buying it; I bought it at enough less to leave me a little profit in it on the limit I got from H. Kempner. I got nothing but the limit from Kempner; I had to use my own judgment in buying."

In buying the cotton, his method was to give his own checks on the Huntsville bank to the sellers, and then next day to draw the drafts for the same amounts. on Kempner with the bills of lading for the cotton attached, together with a letter or confirmation of sale, of which this form is typical:

"Huntsville, Tex.–29–1922.

H. Kempner, Galveston, Texas.—Dear Sirs: We beg to confirm our sale to you this day by { phone / telegraph } of forty (40) { 14 A M / 26 P M } bales cotton at price of 21.15 cents per lb., basis middling, landed Galveston, your weight and grade. Please confirm. Yours very truly,
"J. R. Jordan."

There were such drafts, bills of lading, and confirmations not in effect different, for all

the shipments of cotton he made to Kempner under this agreement he made with Kelly, and he further summarized it as follows:

"My cotton was sold to Kempner on the basis of Galveston weights and grades. That means that it was to be weighed and graded at Galveston, and valued according to those weights and grades at the contract price; the price was the day it was bought, you know; it was according to the price I agreed on with Kempner. When I shipped cotton I did not draw for my advance, not a penny; I just made a draft to cover the checks the Huntsville State Bank had paid out for me. I expected Kempner to owe me the difference between the amount of that draft and the value of the cotton, less the freight. That is the way I expected to make my money."

[2] Under the case as made for the appellee by both its pleading and proof, if Jordan was the agent of appellants to buy cotton in their behalf, he was such solely by virtue of this agreement he so testifies about between himself and Kelly. The bank alleged that Kelly himself was only an agent of appellants, and, in order to recover, it had the burden of showing, in the first place, that he was such for that purpose, and that the alleged employment of Jordan was within the scope of that authority, either actual or apparent; in the second, that Jordan was acting under it in drawing the draft in suit and obtaining the money thereon from the appellee. West Lumber Co. v. Nash (Tex. Civ. App.) 243 S. W. 704; Baker & Co. v. Kellett-Chatham Machinery Co. (Tex. Civ. App.) 84 S. W. 661; Rishworth v. Moss (Tex. Civ. App.) 191 S. W. 843; Overton v. First State Ins. Co. (Tex. Civ. App.) 189 S. W. 514; Simon v. Temple Lumber Co. (Tex. Civ. App.) 146 S. W. 592; P. & N. T. Ry. Co. v. Cox, 157 S. W. 745, 106 Tex. 74; Cummer Mfg. Co. v. First Nat. Bank (Tex. Civ. App.) 173 S. W. 536.

[3] The further question of whether or not, under the developed facts of the case, what the parties have done creates an agency, is one of law for the court. Bradstreet Co. v. Robert Gill, 9 S. W. 753, 72 Tex. 115, 2 L. R. A. 405, 13 Am. St. Rep. 768; Daugherty et al. v. Wiles (Tex. Com. App.) 207 S. W. 900; Brown v. Odneal (Tex. Civ. App.) 239 S. W. 350.

Viewing it most favorably toward the appellee, the undisputed proof demonstrated, we think, that it not only failed to meet the burden thus carried, but also that the transaction had created no sales agency for appellants in Mr. Jordan. The latter made no pretense of knowing anything about Kelly's authority, merely saying that Kelly told him he was acting for H. Kempner—not that he represented himself as having the right to employ agents for Kempner. Nor is there any evidence whatever that Kelly had any authority to employ an agent to buy cotton in behalf of appellant; he himself denied having any, D. W. Kempner for the appellants

said he had none, and no witness testified that he had ever known of his attempting to employ or appoint such an agent; the most that can be made of the testimony of the witness Ball, cashier for the appellee, if indeed it should be given that construction, is that it tends to indicate authority in Kelly himself to buy cotton at Huntsville for appellants; even this much was affirmatively denied by both appellants and Kelly, but, if that is a legitimate inference from Mr. Ball's testimony, it falls far short of showing that he had authority to employ an agent for his principals to do the same thing he could do. Especially is this true when the evidence is barren of a fact or circumstance reasonably tending to show that the appointment of another to buy for his principals might be implied from the nature of the duties Kelly was called upon to perform under his own employment to buy cotton for his firm, assuming that it went that far. Nothing any witness testified to went further than his own statement that on several occasions he had been specially authorized by them to so buy, in each instance, however, at a price fixed by them.

This state of the proof leaves the finding of agency dependent upon the nature of the actual transactions Jordan had with appellants pursuant to his arrangement with Kelly, and, as before indicated, it too fails to furnish support for such a conclusion. Jordan's quoted statement of what the agreement was, the course of the business done under it, and the previously mentioned written confirmations passing between the parties, as to each particular transaction, alike show that no agency was mutually contemplated, or in fact existed, but simply an arrangement for the sale of the cotton upon the one hand and purchase thereof upon the other, Kempners merely furnishing the daily limits of prices at which they would buy it at Galveston on weights and grades determined there, and Jordan meeting those terms by shipping to them cotton he had himself previously bought in the interior. All the rest was merely a method of carrying out that sort of business between them, as Jordan's disclosure of how he was to make his money unmistakably shows; he was to get no commission, per cent., or anything of that kind—simply expected to make the difference between what he paid the farmers and what he got on his resale to Kempners at their prices so furnished him, he to pay the expenses of getting the cotton to Galveston, and agreeing that what was coming to him for it should be based on its weight and grade as determined by them there; nothing else, it seems to us, can be gotten out of the testimony for both sides. It is true that Jordan said he drew the drafts on Kempners for the same amounts he had given his checks for on the Huntsville bank in buying the cotton, and that in several instances, inclusive

of the amount of the draft included in this suit, he deducted from the invoices sent Kempners the charges for ginning, insurance, etc., but still this process was entirely consistent with a sale of the cotton by him to them; these invoices he sent them were for what he in advance estimated they would owe him for the cotton shipped at their limits, and under the undisputed evidence, his drafts on them at the time of shipment, which he testified were for the same amounts as his own checks on the appellee, were only preliminary, as final settlement between them was to be made after the cotton had been weighed and classed at Galveston. So that, as appellants say:

"Such deductions simply showed that from the purchase price he had set aside that amount to cover the charges indicated, and would expect payment of them in addition to the amount for which he had drawn."

[4] It is further true that Mr. Jordan several times stated in his testimony that he bought the cotton for Kempner's account, but, under the facts that were developed, it became evident that these statements were merely his conclusions and therefore not proper support for a finding of fact or a judgment based thereon. Henry v. Phillips, 151 S. W. 533, 105 Tex. 459; Webb v. Reynolds (Tex. Com. App.) 207 S. W. 914; Vaughn v. Charpiot (Tex. Civ. App.) 213 S. W. 950; C., R. I. & G. Ry. Co. v. Johnson (Tex. Civ. App.) 224 S. W. 277.

[5, 6] As is apparent from what has been said, there is likewise no evidence either of ratification by appellants of an employment of Jordan as their agent or of circumstances estopping them from denying such an agency. There is nothing showing knowledge on their part either of the claimed contract with Kelly or that he ever claimed to be so employed, nor did any act of his, shown to have been brought home to them, indicate to them that he was essaying to act as their agent. Every draft drawn and other instrument executed by Jordan indicated that he was a seller, not an agent, and their so treating him could not constitute a ratification of something they knew nothing about.

On the question of estoppel, we quote with approval this expression from the brief of appellants:

"We think it equally clear that by the payment of previous drafts, appellants cannot, under the circumstances shown herein, be held to be estopped from denying the authority of Jordan to draw the one involved in the suit as their agent. No draft they ever paid on its face purported to be a draft of their agent. Ball says that all the previous drafts had bills of lading attached to them. Jordan says that he thinks he had previously drawn several, he did not know how many, which did not have bills of lading attached. Assuming that to be true, how can it be said that appellants in paying drafts drawn by Jordan as an individual misled appellee into believing that Jordan was their agent? And the appellee bank further had knowledge of all the instruments which went through it from Jordan to Kempner, and which indicated a series of sales from the former to the latter. If from those and the payment of the drafts made by appellants the appellee believed that Jordan was Kempner's agent, such belief rested upon an erroneous conclusion which appellee itself drew from the facts, and not upon any misrepresentation of the facts by appellants. If those facts and transactions evidenced an agency in Jordan, then the question as to estoppel is not reached. If they do not evidence such an agency, where in them is to be found a representation by appellants sufficient to work an estoppel against them? Surely it will not be said that a purchaser of a commodity by paying drafts for its price with a bill of lading attached thereby represents that he will pay all such drafts as may be drawn on him in the future by the same drawer. Nor can it be said that a drawee in a draft, who at the time it is presented to him is indebted to the drawer, by honoring the draft misleads a third party into believing that the drawer is an agent of the drawee, when the terms of the draft do not so indicate. And yet that is all that there is here shown upon which to predicate an estoppel against appellants."

These authorities, we think, support our conclusion that there was neither ratification nor estoppel: First National Bank of Greenville v. Pennington, 12 S. W. 1114, 75 Tex. 272; Buzard v. Jolly (Tex. Sup.) 6 S. W. 422; Sheer v. Cummings, 16 S. W. 37, 80 Tex. 294; Eardley Bros. v. Burt (Tex. Civ. App.) 182 S. W. 721; Simon v. Temple Lumber Co. (Tex. Civ. App.) 178 S. W. 681; Hicks Rubber Co. v. Columbia Tire & Rubber Co. (Tex. Civ. App.) 252 S. W. 217; Rosser v. Levi et al. (Tex. Civ. App.) 210 S. W. 314; W. D. Cleveland & Sons v. Houston Sporting Goods Store (Tex. Civ. App.) 166 S. W. 912.

From these conclusions it follows that the judgment should be reversed, and, it appearing that the appellee's case was fully developed, that judgment should here be rendered that it take nothing upon its cause of action. That order has accordingly been entered.

Reversed and rendered.